**In re Anita C. KANU, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 448528).**

No. 08–BG–1401.

District of Columbia Court of Appeals.

Argued Feb. 23, 2010.
Decided Sept. 30, 2010.

Marion E. Baurley for respondent.

Elizabeth A. Herman, Deputy Bar Counsel, with whom Wallace E. Shipp, Jr., Bar Counsel, and Judith Hetherton, Senior Assistant Bar Counsel, were on the brief, for the Office of Bar Counsel.

Elizabeth J. Branda, Executive Attorney, for the Board on Professional Responsibility.

Before BLACKBURNE–RIGSBY, THOMPSON, and OBERLY, Associate Judges.

OBERLY, Associate Judge:

This disciplinary case is before us on exceptions by respondent Anita C. Kanu, a member of the District of Columbia Bar, and by Bar Counsel to the Report and Recommendation of the Board on Professional Responsibility. The Board recommended that we find that Kanu violated District of Columbia Rules of Professional Conduct 1.16(d) (failure to refund unearned fees), 7.1 (false or misleading statements about her services) and 8.4(c) (conduct involving fraud, dishonesty, deceit or misrepresentation), arising out of Kanu's failure to refund fees she had promised to return to two clients if she did not succeed in obtaining for them the immigration status for which they sought her services. We adopt the Board's report in large part, rejecting Kanu's arguments that she had insufficient notice of the substance of Bar Counsel's allegations against her and that the Board's Hearing Committee's findings

were based on internally inconsistent findings of fact or were not supported by substantial evidence in the record. But we overturn the Board's dismissal of Kanu's violation of Rule 8.4(d) (serious interference with the administration of justice)—a dismissal that was based on Bar Counsel's failure to obtain from the Board a motion to compel before charging a violation of this Rule. Finally, we adopt the sanction that the Board recommended to this court and order that Kanu be disbarred and, further, that as a condition of reinstatement she make restitution to her clients in the amounts found due by the Board.

## I. Facts and Procedural History

Attorney Anita Kanu was admitted to practice law in the District of Columbia in 1995, after graduating from law school in 1992. Since 1995, Kanu has lived and practiced law in California, although she has spent much of that time either out of the country or living in Arizona while tending to personal matters. Although she maintained a law office in California, respondent is not a member of the California Bar. Her law practice focused primarily on immigration law and, in particular, on processing visa applications for religious workers. At some point during her practice, an organization named Chinese Christian Services ("CCS") began to make referrals to Kanu, asking her to obtain immigration benefits for the group's religious workers.

In 2003, according to Kanu, CCS told Kanu that because of her success in securing immigration benefits for its workers in the past, CCS would like to "use her more exclusively as a referral source. [CCS], however, strongly suggested to her that she include a refund clause in the retainer letter [she] offered clients that [CCS] referred to her." After some discussion, Kanu agreed and added the following language to at least some of her retainer agreements: "Refund Clause: We also represented to that [sic] if the lawyer accepts your case, the law firm would try their best to proceed with your case. In the event the Immigration Office rejects your green card, we shall refund to you all the money you have paid in to that date."

CCS referred to Kanu two new clients, Mr. Li and Mr. Hu, who would later become complainants against Kanu in her disciplinary proceedings. Both were Chinese students whose United States visas were approaching their expiration dates. Both men wished to remain in the United States and had contacted CCS to find out about immigration benefits available to religious workers. Li and Hu separately met with a representative from CCS and Kanu, and each retained her to handle their visa applications. In 2003, in accordance with Kanu's retainer agreements, Li paid Kanu $7,000 and Hu paid Kanu $6,000. Kanu told Hu that she could obtain a religious worker visa for him within three months, and a green card within a year. Kanu made no similar promise to Li regarding the time it would take to get his visa.

Kanu then prepared visa applications for Li and Hu based on their alleged status as "religious workers," even though the students testified that Kanu knew that neither one was qualified to receive immigration benefits based on that particular status. Li testified that he was concerned that Kanu did not ask him to establish his history of participation in a church at all and had assured him that he would not need to worry about his lack of experience as a religious worker because she would "take care" of the issue for him. Li also testified that Kanu told him that she would "train [him] how to tell [the] Immigration Office, how to convince them [that he was] qualified for [the religious worker visa]." Hu testified that he "did not in

**4**

fact have any background as a religious worker, did not belong to any denomination, did not attend church, and was not a religious person." When Kanu "asked him if he was a minister or if he had ever worked for a church, he said 'no.' "

After Kanu's initial meetings with Li and Hu and her acceptance of their retainer payments, she had very little communication with them. Li testified that he tried on numerous occasions to contact Kanu about providing the government with documentation that had been requested to support his visa application. Despite his leaving numerous messages at her office, she did not respond to him nor did she provide him with reports concerning the status of his case. Li learned that his visa application had been denied only through his own research on the government's website.

Hu's relationship with Kanu was similar. When he tried to contact her approximately three months after he first paid her a retainer, which coincided with the time by which he thought he could expect to receive his visa, he did not obtain any response. He continued his efforts to make contact with her via fax, telephone and email "at least once, and often many more times, per month." Kanu did not respond to Hu's repeated inquiries for approximately ten months. Like Li, Hu learned that his visa had been denied only by searching the government's website.

After Li and Hu independently learned that their visa petitions had been denied, both students requested refunds from Kanu. Li first left messages for Kanu requesting a refund in July 2004. Kanu testified that after Li initially requested his refund, she told him his case would be reopened, even though Kanu conceded that—for reasons not relevant here—that was not legally possible. In July 2004, Li sent Kanu a certified letter again requesting his refund, and although Kanu's office signed for the letter, she denied that Li requested a refund. In May 2005, however (after Li's complaints about Kanu had made their way to the D.C. Bar), Kanu contacted Li and told him he would receive a refund "within a couple of weeks." Nonetheless, Kanu did not provide the refund, and Li did not hear anything more from her.

Kanu also failed to communicate with Hu about his refund request, which he first made in September 2004. At that time, Kanu asked him to give her until the end of the year to obtain the visa. He agreed, but when he found out from his own research that his visa application had been denied in January 2005, Hu again demanded a refund. Eventually, Kanu told Hu that she would send him his refund but never did so. Kanu explains her failure to repay both clients' refunds by saying that "she had spent the money she had received [from Hu and Li] and had to await receipt of other funds to make good on her promises. She has not received sufficient funds, to date. So, she has not made the requested refunds."

Kanu came to the attention of the D.C. Bar in April 2005, after Li had filed a complaint with the State Bar of Arizona (where Kanu was living at the time). The State Bar of Arizona forwarded the complaint to the California State Bar, which sent it to the Bureau of Citizenship and Immigration Services ("CIS"), which then forwarded Li's complaint to the D.C. Bar. In July 2005, Kanu wrote to D.C. Deputy Bar Counsel Elizabeth A. Herman about Li's allegations, apparently in response to an inquiry from Bar Counsel. (According to the Hearing Committee, "[t]he date and content of the Bar Counsel correspondence or communication that prompted [Ms. Kanu's] response is unclear.") Kanu stated that she was in contact with Li about

the amount of the refund due him. Herman asked Kanu for clarification about Li's refund, and Kanu responded in August 2005, indicating that she had "resolved to give [Li] a full refund." Herman again asked Kanu for more information and stated that "[i]f the full refund is not in Mr. Li's hands by September 5, 2005, we will write up charges against you." Kanu then sent Herman a copy of a $7,000 check she said she had sent to Li. Kanu claimed that the postal service returned this check to Kanu as undelivered, but she made no effort to resend the check or to inform Herman that the check had not reached Li. On September 13, 2005, Herman spoke with Li, who told her that he never received Kanu's check; Herman wrote to Kanu again, asking for an explanation, but Kanu did not respond.

On August 24, 2005, Herman notified Kanu by letter that Hu also had filed a complaint against her with the State Bar of Arizona. Herman requested a substantive written response from Kanu no later than September 5, 2005. When Herman received no response, she sent another letter to Kanu, advising her "of the possibility of disciplinary sanctions in the event of her failure to respond" to the inquiry. The letter gave Kanu additional time to provide a response, but she did not do so. Herman spoke with Kanu by phone on September 15 and 28, 2005, and again directed Kanu to respond to the Bar's inquiries about Hu. Kanu did not respond.

In October 2005, a third client of Kanu's, Mr. Kamara, filed a complaint against her. Bar Counsel requested a response from Kanu, who sent a letter asking for a two-week extension within which to file her response. Bar Counsel granted the requested extension, but Kanu did not respond until January 2007—more than one

year later and after the disciplinary hearings in her case had begun.

In March 2006, Bar Counsel filed a three-count Specification of Charges against Kanu. Bar Counsel alleged that in connection with her representation of Li, Hu and Kamara, Kanu had violated five Rules of Professional Conduct:

● Count I (client Li) charged Kanu with violations of Rules 1.15(d) (failure to safekeep property), 1.16(d) (failure to return unearned fee), and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit and/or misrepresentation).

● Count II (client Hu) charged Kanu with a violation of Rules 1.15(d), 1.16(d), 7.1 (false or misleading communications regarding lawyer's services), 8.4(c) and 8.4(d) (engaging in conduct that seriously interferes with the administration of justice).

● Count III (client Kamara) charged Kanu with a violation of Rule 8.4(d).

A Hearing Committee of the Board held a hearing in January and February 2007 at which Bar Counsel, Kanu and her counsel appeared. After the hearing, the Committee issued its report, concluding that Kanu had violated all of the Rules in Bar Counsel's Specification of Charges, except for Rule 1.15(d) (failure to safekeep property) charged in Li's and Hu's cases. The Hearing Committee decided that Kanu did not violate Rule 1.15(d) because Li's and Hu's retainers became her property when the clients paid Kanu the money, "such that [Kanu] could commingle them with her operating funds and spend them, but that [Kanu] obligated herself contractually to refund an equivalent amount if she failed to perform by obtaining the immigration benefits promised."[1]

---

1. After the Hearing Committee issued its Report and Recommendation in Kanu's case, this court decided *In re Mance,* 980 A.2d 1196 (D.C.2009), in which we applied Rule 1.15(d)

Turning to the alleged violation of Rule 8.4(d), the Committee *sua sponte* noted that "contrary to the practice that has prevailed for nearly two decades, Bar Counsel did not seek an order in these cases from the Board on Professional Responsibility compelling a response." The Committee pondered whether a violation of Rule 8.4(d) could be supported where Bar Counsel did not seek an order from the Board compelling compliance with its requests for information, but it ultimately determined that Kanu's Rule 8.4(d) charge would stand.

The Hearing Committee then addressed the appropriate sanction for Kanu's misconduct. Although the Committee did not cite "immigration fraud" as the basis for its findings that Kanu violated various Rules of Professional Responsibility, the Committee's findings as to immigration fraud did substantially affect its disciplinary recommendation. According to the Committee, Kanu's "overall conduct . . . is to be considered in assessing the appropriate sanction, and it is clear that the immigration fraud aspect of the conduct bears on central issues relating to sanction such as the risk of harm to the clients posed by [Kanu's] conduct." The Committee stated that "[i]t is beyond question that an enterprise necessarily entailing an immigration benefits fraud on the United States government is one that would have—and did—subject [Kanu's] clients and the third party organizations to very serious risks." Indeed, the Committee concluded that Kanu "would have been hard pressed to devise a strategy that placed her client's

[sic] objectives and general welfare in greater jeopardy."

Rejecting Bar Counsel's recommendation of a 90–day suspension with all but 60 days stayed in favor of one year's probation with conditions (restitution to her clients, Continuing Legal Education and certain disclosures to her clients during her probationary period), the Hearing Committee recommended to the Board on Professional Responsibility the sanction of a two-year suspension with fitness and restitution requirements. The Committee engaged in a detailed analysis of the factors that led it to conclude that this is "one of those exceptional cases in which accepting Bar Counsel's recommendation would result in an insufficient sanction." Instead, the Committee concluded that Kanu's misconduct was "sufficiently serious to warrant a substantially greater suspension of two years," as well as proof of fitness to practice as a condition of reinstatement to provide "adequate protection of the public."

The Board adopted the Hearing Committee's report in large part, but recommended that the charges for violations of Rule 8.4(d) (as contained in Counts II and III) be dismissed because Bar Counsel had not obtained an order to compel from the Board. The Board was "troubled by Bar Counsel's failure to utilize [the order to compel] mechanism" and cited a ruling from the Board's Chair to support its assertion that "in order for Bar Counsel to 'prove a charge of failure to cooperate, Bar

---

to flat fees for the first time, holding that "when an attorney receives payment of a flat fee at the outset of a representation, the payment is an 'advance of unearned fees' and 'shall be treated as property of the client until earned unless the client consents to a different arrangement.' " *Id.* at 1202 (quoting Rule 1.15(d) (internal editing omitted)). Because our holding in *In re Mance* was prospective

only, *see id.* at 1206, we do not disturb the conclusion reached by the Hearing Committee and the Board that Kanu did not violate Rule 1.15(d) when she commingled Li's and Hu's retainers with her own funds. For essentially the same reason, we do not reach the issue of the applicability of *In re Addams*, 579 A.2d 190 (D.C.1990) (en banc), to Kanu's case. See also *infra*, note 4.

Counsel must first seek an order to compel from the Board.'"

## II. Analysis

### A. Due Process Challenge

Kanu argues to our court, as she did to the Board, that she had no notice from Bar Counsel's Specification of Charges that she would have "to defend herself against allegations that she was engaged in a scheme to perpetrate immigration fraud." Kanu asserts that had she known that "the very basis of her representation" of Li and Hu, *i.e.*, immigration work, was at issue, she would have presented a different case, eliciting testimony from the sponsors of Li's and Hu's immigration petitions and testimony from a CCS representative, as well as evidence about her previous success in obtaining benefits on behalf of CCS clients.

Thus, we must consider whether "the specification of charges ... fairly put [Kanu] on notice of the ... charges against [her]." *In re Austin*, 858 A.2d 969, 976 (D.C.2004) (citing *In re Hager*, 812 A.2d 904, 917 n. 14 (D.C.2002)). In determining whether the requirements of due process have been satisfied, however, we look not only to the Specification of Charges, but also to subsequent filings by Bar Counsel to determine whether a respondent had sufficient notice of the charges. *See In re Austin*, 858 A.2d at 970, 976 (holding that respondent charged with Rule 8.4(c) dishonesty had received sufficient notice that he was also charged with fraud where Bar Counsel's post-hearing brief added details to the pre-hearing charges, and "respondent did not object to the facts as stated by Bar Counsel or file any exception with the Board").

In Kanu's case, Bar Counsel's Specification of Charges did not mention immigration fraud or fraud against the federal government, but charged Kanu with financial misconduct, fraud and dishonesty in dealing with her clients. In the charging document, Bar Counsel stated that Li and Hu had retained Kanu to assist them in obtaining either adjustments of their visa status or "green cards" as religious workers, and went on to detail the retainer agreements Kanu had with each client, the money the clients gave to Kanu, and Kanu's failure in each case to fulfill the obligations she undertook in the retainer agreements. The Specification of Charges included references to "the Immigration Office" and "the United States Citizenship and Immigration Services" to explain which offices had rejected Li's and Hu's applications for religious worker status, but otherwise did not allege that Kanu had deliberately committed fraud in her dealings with immigration authorities.

■ We agree with the Board that "[a] fair reading of the Specification of Charges would put one on notice that the fraud charges related to [Kanu's] dealings with Mr. Li and Mr. Hu in 2003–2005 in connection with her engagement to seek adjustments in their immigration status." Bar Counsel alleged that Kanu had committed herself to refund her clients' money and then failed to abide by that obligation when she could not obtain the promised visa benefits for her clients. The hearing on those charges necessarily included testimony about denial of the clients' visa applications. In the end, although Bar Counsel elicited and the Board discussed the fact that neither Li nor Hu qualified for the religious worker visas Kanu sought on their behalf, they did so to show and explain how Kanu made promises to her clients about obtaining religious-worker visas while knowing that "there was no honest means for [her] to fulfill the promises she made" and that "performance of [her] guarantees was impossible without involving herself, her clients, and third parties in an immigration benefits fraud." We agree

with Bar Counsel that the immigration fraud issue arose "as a logical inference from [Kanu's] overall fraudulent relationship with her clients."

Moreover, we are unpersuaded by Kanu's argument that she was prejudiced by the alleged lack of notice. Kanu claims that "[i]f the charging document had even hinted at" the issue of immigration fraud, she would have "1) tried to procure testimony from the sponsors in the immigration petitions she had filed for these clients, 2) tried harder to locate Mr. John Li [her contact with CCS], and being unsuccessful at that, found some other knowledgeable person at [CCS], 3) presented sponsors from other, earlier successful petitions she had filed through clients brought to her from [CCS], and 4) presented the testimony of other clients referred from [CCS]." But Kanu does not tell us (nor did she tell the Hearing Committee or the Board) what testimony she would have elicited from any of these witnesses or how it would have helped her defense. We are unwilling to speculate about the relevance of testimony from Li's and Hu's sponsors or Kanu's contact with CCS. Likewise, it is difficult to fathom the relevance of testimony about Kanu's past successes with different CCS clients when the disciplinary action against her in this case focused on her misrepresentations to Li and Hu in the handling of their visa petitions and in response to their claims for refunds. Again, Kanu made no proffer, but if we assume that she would have tried to use her prior successes to show that she had some reason to believe she could achieve the results she promised to Li and Hu, such testimony would not have explained why she avoided Li's and Hu's messages requesting their refunds after their visa petitions had been denied. In short, any testimony about successes she had had with other clients would have been irrelevant to her defense of her representation of Li and Hu in

preparing their applications, in keeping them informed about the status of their matters, and in handling their requests for refunds. Cf. Zacarias v. United States, 884 A.2d 83, 89 (D.C.2005) (holding that a criminal defendant was not prejudiced by an alleged variance from an indictment because he "ha[d] not shown that his defense would have been any different" if there had been no variance).

Kanu's due process argument might have some force had the Hearing Committee or the Board used Kanu's alleged immigration fraud as a basis for their eventual conclusions that she had violated Rules 7.1 (false or misleading communications regarding lawyer's services) and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit and misrepresentation). But it was Kanu's failure to communicate honestly with her clients (and, for long periods of time, her failure to communicate with them at all) and to refund money that she had promised them that formed the basis of the charges against her. The Hearing Committee and the Board found rule violations based on Kanu's "dishonesty toward her clients and not [on] an immigration fraud on the U.S. government," and the Hearing Committee explicitly stated that Bar Counsel was not requesting a conclusion of law about immigration fraud and that the Committee was "disinclined to find a separate violation" on the basis of immigration fraud. As we have described earlier, the Committee did consider immigration fraud in its analysis of the harm Kanu's conduct caused to her clients and in its determination of the sanction to recommend to the Board, a consideration that is entirely appropriate. See In re Anderson, 979 A.2d 1206, 1213–14, 1220 (D.C.2009) (detailing and analyzing financial harm to a client in a misappropriation case).

Kanu cites *In re Ruffalo,* 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968), for the proposition that a due process violation exists when a charging document fails to provide fair notice of the charges, but that case does not change our conclusion. There, immediately after hearing testimony from the respondent and a witness, the Ohio Board of Commissioners on Grievances and Discipline added a charge against attorney Ruffalo that had not appeared in the original charging document. *Id.* at 546, 88 S.Ct. 1222. Ruffalo objected strenuously to the addition, but his objections were overruled and the added charge became the sole basis for his eventual disbarment. *Id.* at 546, 549, 88 S.Ct. 1222. The Court concluded that Ruffalo had no fair notice of the charges against him because, by adding the charge mid-hearing, the hearings became "a trap when, after they [were] underway, the charges [were] amended on the basis of testimony of [Ruffalo]." *Id.* at 551, 88 S.Ct. 1222.

Here, the Hearing Committee and the Board did not add any charges mid-hearing and Kanu acknowledges that Bar Counsel did not argue immigration fraud at the hearing. Early in the proceedings before the Hearing Committee, Kanu had notice that Bar Counsel was presenting, through the testimony of Li and Hu, evidence indicative of immigration fraud, "conduct which all responsible attorneys would recognize as improper for a member of the profession." *In re Slattery,* 767 A.2d 203, 211 (D.C.2001) (quoting *In re Ruffalo,* 390 U.S. at 555, 88 S.Ct. 1222 (White, J., concurring)). Unlike the attorney in *Ruffalo,* Kanu did nothing to voice her objection to the supposedly unexpected allegations that arose at the hearing. As the Board noted, Kanu, who was represented by competent counsel, "made no motion to strike . . . statements [about the clients' ineligibility for religious worker status] in Bar Counsel's post-hearing papers as irrelevant and beyond the scope of the charges, or even raise the issue of surprise." Bar Counsel also noted that Kanu "did not move for a bill of particulars, object at the hearing, or raise the issue to the Hearing Committee." And Bar Counsel's brief urging the Board to adopt the Hearing Committee's Report clearly signaled that Kanu faced discipline based on the evidence (primarily, the testimony of Li and Hu) that she committed immigration fraud.

Under these circumstances, we hold that the Specification of Charges did "assert a plain and concise statement of [the] alleged offense[s] sufficient to put [Kanu] on notice of the nature of the offense[s] charged." *Patterson v. United States,* 575 A.2d 305 (D.C.1990) (citation omitted); *see In re Austin,* 858 A.2d at 976 (concluding that "the specification of charges and post-hearing filings fairly put respondent on notice of the fraud charges against him"); *In re Slattery,* 767 A.2d at 208–09 (determining that Bar Counsel's Specification of Charges listing "theft" as an alleged violation fairly put Slattery on notice that "theft by conversion and misappropriation" was the alleged misconduct).

### B. Hearing Committee's Findings of Fact

Kanu next argues that the Rule 7.1 and 8.4(c) violations "cannot stand" because they are "based on internally inconsistent findings of fact, or factual findings not supported by substantial evidence." We reject as utterly lacking in merit Kanu's challenges to the facts found by the Hearing Committee and adopted by the Board.

First, Kanu asserts that the Hearing Committee held two mutually exclusive views: (1) that Kanu "knew at the outset that the promises of obtaining the [immigration] benefits were false," and (2) that as her legal "representations developed, it

became clear that the benefits would not be forthcoming." Read as a whole, the Hearing Committee's findings are not internally inconsistent. The Committee found that Kanu did not request documents from Li and Hu that would have been necessary for their applications for religious worker visas to be approved. Moreover, Kanu led Hu to believe that she could obtain his visa in a time frame she should have known to be unrealistic or, at a minimum, dependent on the "vagaries of administrative action within a government agency." Later, Kanu learned that she would not receive other documents she had expected from CCS in support of the applications. What these facts tell us is that from the start, Kanu knew she did not have the necessary information from the students (certainly not what was needed to meet the time frame she led Hu to expect) and that later, when she learned she would not get additional information from CCS, any remote possibility of obtaining the visas evaporated. These are not contradictory findings but, rather, sequential determinations of the facts as they evolved. As the Hearing Committee reasoned, "[e]ven if [Kanu] had an expectation at the outset of legitimately procuring R–1 and/or special immigrant status for these clients—a proposition we reject—she reached a point in these cases at which that expectation ceased to be realistic or reasonable. . . ."

Second, Kanu claims that the Hearing Committee's findings were not supported by substantial evidence. Kanu asserts that one statement in the Hearing Committee's findings was "overly broad," but we disagree. The Committee stated that "[Kanu]'s engagement agreements with clients referred to her by CCS contained provisions guaranteeing a refund of all fees paid in to date in the event the desired immigration benefits were not obtained." Kanu observes that the Committee's finding did not take into account Kanu's "suc-cessful working relationship" with CCS for three years prior to the time when CCS asked her to include a refund clause in the agreements, and therefore fails to note that it was because of that relationship that CCS's request for refund clauses "seemed harmless enough."

Kanu is correct that, according to the evidence presented, before August 2003 her engagement letters did not include a refund clause, but Kanu's objection to the Committee's omission of that qualification proves nothing of relevance to *this* case. No one disputes that Kanu's retainer agreements with Li and Hu contained refund clauses. The fact that *some* of Kanu's engagement agreements with CCS clients for whom she worked before she met Li and Hu did not include refund clauses does not make the Committee's sentence false and, in any event, this one sentence has no bearing on the accuracy of the findings about the letters at issue in Li's and Hu's cases. Also irrelevant is the fact that Kanu had a "well[-]defined and apparently successful working relationship" with CCS. Kanu put the refund clauses in her retainer agreements and it was her responsibility to abide by the obligations the clauses created, whether or not she had a good professional relationship with CCS.

■ Finally, Kanu claims that the Hearing Committee's credibility determinations are not supported by substantial evidence. To be sure, Kanu and her clients presented different accounts of her work for them, but the Hearing Committee heard those competing accounts and made credibility determinations based on the evidence. "[I]t is axiomatic that determinations of credibility and the weighing of evidence are within the province of the fact-finder." *Ventura v. United States,* 927 A.2d 1090, 1104 (D.C.2007) (citation

omitted). This court is in no position to overturn such factual findings when, as Bar Counsel noted, the Committee "observed the witnesses, questioned them and assessed their truthfulness."

## C. Board's Dismissal of Rule 8.4(d) Violation

There is no question on the record of this case that Kanu not only evaded inquiries from her clients but, after they initiated complaints, she flagrantly and repeatedly failed to respond to numerous written and telephonic inquiries from Bar Counsel seeking to investigate those complaints. See pp. 5–8, *supra*. Accordingly, Bar Counsel included in its Specification of Charges two counts of violating Rule 8.4(d) (serious interference with the administration of justice). The Hearing Committee noted *sua sponte* that, contrary to its customary practice, Bar Counsel had not first requested the Board to issue orders to compel responses. Nonetheless, the Hearing Committee upheld the charges after a thorough analysis of the Board and Bar rules that provide the means by which Bar Counsel *may* seek Board enforcement of its investigative requests, concluding that a "charge of serious interference with the administration of justice [may also] be supported by the failure to respond to an inquiry from Bar Counsel standing alone." On review, the Board dismissed the Hearing Committee's finding of a Rule 8.4(d) violation, holding that Bar Counsel *must* seek a Board order commanding compliance with Bar Counsel's investigatory requests before it can charge a violation of Rule 8.4(d). Citing to an order of its Chair acting alone, the Board explained its view that "it is the failure to respond to the [Board order to compel] that is grounds for discipline."

▮ The situation before us appears to arise only infrequently. Bar Counsel tells us that "[t]here are many times when Bar Counsel seeks an order to compel, and [it does] so for a variety of reasons, using [its] prosecutorial judgment as to when such an order would be helpful to [its] investigations and prosecutions." According to Bar Counsel, in the majority of cases, an order to compel "may prove helpful in obtaining responses" or may be useful "where there may be a question whether a response provided is adequate." But when an attorney has not responded at all, as Kanu failed to do with respect to Hu and Kamara, Bar Counsel argues that it should be permitted to charge a Rule 8.4(d) violation without first seeking an order to compel. We agree. We believe the Board confuses the situations in which Bar Counsel may find it useful to enlist the assistance of the Board in securing compliance with an investigative inquiry with those situations in which Bar Counsel seeks to enforce Bar and Board rules that demand compliance with Bar Counsel's inquiries and make the failure to respond thereto itself an instance of professional misconduct. It makes sense that there is a procedure allowing Bar Counsel to seek the aid of the Board in the former situations, but it does not make sense to read the rules as stripping Bar Counsel of the authority to make a charging decision to allege a disciplinary violation for failure to comply with Bar and Board rules that require members of the Bar to answer Bar Counsel's inquiries.

Support for the dichotomy we draw is apparent from the plain language of the applicable rules. First, under D.C. Bar Rule XI, § 8(a), "[a]n attorney under investigation has an obligation to respond to Bar Counsel's written inquiries in the conduct of an investigation, subject to constitutional limitations." Similarly, Board Rule 2.8 requires a attorney under investigation to respond to Bar Counsel's inquiry

within 10 days from the date Bar Counsel mails the notice of investigation.

There is nothing in the language of either of these rules, however, that would *require* Bar Counsel to seek an order to compel to enforce compliance with their terms. Rather, D.C. Bar Rule XI, § 8(a) states that "[i]n the event of an attorney's failure to respond to [an inquiry from Bar Counsel], Bar Counsel *may* request the Board to enter an appropriate order." (Emphasis added.) Board rules include a similar provision: "[i]f a respondent fails to respond to Bar Counsel's written inquiries in the course of an investigation, Bar Counsel *may* file a written motion, with a copy to the respondent, that the Board enter an order compelling a response and for such other relief as may be appropriate." Board Rule 2.10 (emphasis added).

Similarly, Rule 8.4(d) provides that it is "professional misconduct" for a lawyer to "[e]ngage in conduct that seriously interferes with the administration of justice." The comments to this rule state that such conduct includes, *inter alia*, "failure to respond to Bar Counsel's inquiries or subpoenas." Nothing in the language of the rule or the comments, however, *requires* Bar Counsel to seek the imprimatur of the Board before charging a Rule 8.4(d) violation.

The Board claims support for its position from the 1989 Amendments to Rule XI of the D.C. Bar, which specifically and for the first time established a mechanism for Bar Counsel to request a Board or court order to compel compliance with an investigatory request issued by Bar Counsel. Ironically, however, the Board and the D.C. Bar Board of Governors submitted comments on the proposed new rule stating that such a mechanism was unnecessary and that the "current methods for [Bar Counsel to] obtain[ ] information from attorneys are adequate." The Board add-

ed that "[a]n order of the BPR would not add any coercive influence to Bar Counsel's subpoena."

Without explanation, the authority the Board proposed for deletion as unnecessary was nonetheless made a part of the 1989 Amendments. The position taken by the Board in the case before us therefore requires that we determine whether the 1989 Amendments were meant to contract the authority of Bar Counsel to enforce its own investigative inquiries by charging violations of Rule 8.4(d) without first seeking a Board order to compel, even though it had routinely done just that by enforcing its own investigative inquiries under DR 1–102(A)(5), the predecessor to Rule 8.4(d). *See, e.g., In re Jones,* 544 A.2d 695, 697 (D.C.1988); *In re Haupt,* 444 A.2d 317, 318, 326 (D.C.1982). We are unable to find any support for the Board's position that such was the intention of this court in adopting the Amendments.

In our view, none of the 1989 amendments added any requirement that Bar Counsel must obtain an order to compel to charge a violation of Rule 8.4(d). As the Board notes, "[t]he 1989 amendments to sections 2(b) and 8(a) of [Bar] Rule XI and Board Rule 2.10 clearly established a new enforcement procedure to compel compliance with Bar Counsel's inquiries," but it concedes that "the literal language of the rules does not provide clear evidence that the amendments were intended to require an enforcement order to establish a disciplinary violation based on the failure to respond." Absent such evidence, we decline to adopt the Board's interpretation, reading into the rules requirements that are not explicitly there.

We understand the Board's concern that Bar Counsel, by not seeking an order to compel from the Board before charging a violation of Rule 8.4(d), may become both prosecutor and judge in the same matter

as, for example, when the subject of an investigation objects to Bar Counsel's inquiry as overbroad or unduly burdensome. It is true that requiring Bar Counsel to seek a Board order to compel enforcement of its inquiries would give respondents a forum in which to raise such challenges. But at least at the time of the 1989 amendments to Bar Rule XI, the Board did not view the opportunity to raise a challenge to Bar Counsel's inquiries as "either necessary or desirable." In its comments about the possibility of adding a process for interlocutory appeals from Bar Counsel inquiries, the Board stated that there would be "no need" to provide such a procedure because it "[was] not aware of any instances of Bar Counsel abusing its investigatory powers." As the Board put it, if an attorney wished to challenge the scope of an inquiry from Bar Counsel, he or she "could resist an inquiry . . . and any disciplinary action based on such resistance would surely involve a review of the propriety of Bar Counsel's inquiry." The Board continued by arguing that "[s]ince overbreadth of Bar Counsel's inquiries is rarely, if ever, an issue, we believe the proposed review procedure [of an interlocutory appeal of a Bar Counsel inquiry] is unnecessary." Moreover, as the Board saw it, the imposition of this interlocutory appeal procedure would pose a danger of "serious delay in disciplinary investigations, allowing an attorney to seek review before the BPR and the Court of a Bar Counsel inquiry that, we are confident, is virtually certain to be upheld."

In short, we agree with the Board's Hearing Committee and with Bar Counsel. The Hearing Committee analyzed the rules and the 1989 amendments and concluded that "nothing on the face of [the] amendments suggests, at least in a clear or explicit way, that the Court intended by amending Rule XI to effect an administrative reversal of its jurisprudence holding that failure to respond to an investigative inquiry from Bar Counsel is actionable within the disciplinary system as conduct prejudicial to the administration of justice." The Committee also recognized that in future cases, if Bar Counsel brings a Rule 8.4(d) violation without a Board order, "future hearing committees and the Board will inevitably have to assess the conduct in each situation to determine whether the facts truly reflect serious interference with the administration of justice as opposed to, for example, merely an overheated litigative dispute between the parties or a principled objection by a Respondent to the disclosures sought." Bar Counsel's explanation of when it seeks a BPR order asking the Board to issue an order to compel, see *supra* p. 11, and the plain language of the rules lead us to the same conclusion.

### D. Sanction

■ The Board initially recommended to this court a two-year suspension with reinstatement conditioned on a showing of fitness, as well as restitution to Kanu's clients. Before we heard oral argument in Kanu's case, however, another division of this court decided *In re Cleaver–Bascombe*, 986 A.2d 1191 (D.C.2010) (per curiam) (*In re Cleaver–Bascombe II*). In that case, an attorney who had been appointed to represent an indigent criminal defendant under the Criminal Justice Act submitted a fraudulent voucher to the court seeking compensation for services she had not rendered. *Id.* at 1193. This court ordered Cleaver–Bascombe disbarred, among other things, because she had lied under oath about the services she had provided to her client. *Id.* at 1200.

In addition, at oral argument this division considered the similarities between Kanu's failure to return a promised refund to her clients for six years and the misap-

propriation of client funds that was at issue in *In re Addams,* 579 A.2d 190 (D.C. 1990) (en banc). There, Addams intentionally misappropriated client funds and then misrepresented that fact to his client. *Id.* at 191. We determined that "in virtually all cases of misappropriation, disbarment will be the only appropriate sanction unless ... the misconduct resulted from nothing more than simple negligence." *Id.* Moreover, we have said that "an honest mistake" in taking money that did not belong to an attorney may "ripen[ ] into misappropriation because of the unreasonably long delay in repaying" the money to the client, and may call for disbarment. *In re Utley,* 698 A.2d 446, 449–50 (D.C. 1997).

With *In re Cleaver–Bascombe II, In re Addams* and *In re Utley* in mind, after oral argument we requested from all parties supplemental briefs to answer two questions: "[S]hould this court's decision in *In re Cleaver–Bascombe* ... affect the sanctions, if any, to be imposed upon Ms. Kanu?" and "[I]s this court's decision in *In re Addams* ... applicable to the determination of sanctions in this case?" In response, both Bar Counsel and the Board argued that Kanu's conduct was sufficiently similar to the fraudulent conduct at issue in Cleaver–Bascombe's case that we should order Kanu disbarred. With respect to the applicability of *In re Addams,* the Board opined that "[i]nsofar as [Kanu's] conduct verged dangerously close to misappropriation, *Addams* provides a useful comparison, establishes the severity of [Kanu's] violation and counsels in favor of disbarment," but ultimately urged that *Addams* should not apply to the determination of an appropriate sanction in this case because the fees paid by Li and Hu were not client funds. Bar Counsel likewise argued that *Addams* provided a helpful analogy that the court could use to reinforce *Utley's* message that a "pro-

longed and unjustified failure to return an unearned fee may ... result in disbarment," but urged that application of the *Addams* presumptive rule of disbarment should be given only prospective effect. Both Bar Counsel and the Board then sought leave to file additional supplemental briefs in which they argued further over the wisdom of applying *Addams'* presumptive rule to a case such as this, with Bar Counsel continuing to urge a prospective extension of *Addams,* while the Board continued to argue that *Addams* should be limited to cases involving client funds, which it did not believe this case to be.

 Under D.C. Bar Rule XI, § 9(h), we "adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." *Accord In re Cleaver–Bascombe II,* 986 A.2d at 1194; *In re Elgin,* 918 A.2d 362, 373 (D.C.2007). We have said that "[g]enerally ... if the Board's recommended sanction falls within a wide range of acceptable outcomes, it will be adopted and imposed." *In re Cleaver–Bascombe II,* 986 A.2d at 1194 (quotation marks omitted). "Ultimately, however, the system of attorney discipline, including the imposition of sanctions, is the responsibility and duty of this court," *id.* at 1195 (citing *In re Hutchinson,* 534 A.2d 919, 924 (D.C.1987)), and "[t]o determine what discipline is appropriate under the circumstances, we review the respondent's violations in light of all the relevant factors." *Id.* (citing *In re Reback,* 513 A.2d 226, 231 (D.C.1986) (en banc)). Those factors include "(1) the nature of the violation, (2) the mitigating and aggravating circumstances, (3) the need to protect the public, the courts, and the legal profession, and (4) the moral fitness of the attorney." *Id.* (internal editing and citations omitted). In light of these factors and our disposition in

*In re Cleaver–Bascombe II*, we agree with the position taken by the Board and Bar Counsel in their supplemental briefs that Kanu should be disbarred.

The nature of Kanu's violations supports imposition of this sanction. Kanu took money from her clients and promised to refund the money if she was not able to obtain the benefits they sought. When she realized that she could not do what she had promised to do, she evaded her clients' requests for information, leaving them to find out on a government website that their visa petitions had been denied, and she then compounded her misconduct by lying to her clients and to Bar Counsel about the status of her efforts to make good on the refund obligation to which she had committed. Such "dishonesty of a flagrant kind" confirms that Kanu "lacks [the] moral rectitude needed to be a member of the legal profession." *In re Cleaver–Bascombe II*, 986 A.2d at 1199; *see also In re Reback*, 513 A.2d at 231 (lawyers' "failure to tell their client[s] that [their] case[s] had been dismissed formed a dishonest course of conduct that is plainly intolerable").

Although Kanu has had no prior disciplinary proceedings, there are several aggravating factors that weigh against her. First, we must view the injury to Kanu's clients as an aggravating factor. *See In re Cleaver–Bascombe II*, 986 A.2d at 1200. Li and Hu paid $13,000 for services that were never completed and faced significant delays when they tried to get their refunds. As Hu testified, six thousand dollars was "a very big amount" of money to him and because he was a student with no income at the time, he had to obtain the money to pay Kanu from his parents. Even now, Li and Hu have not received all of the money owed to them.[2]

Moreover, Kanu's clients entrusted her to handle matters of the utmost importance to them—their ability to remain in the United States. *See Padilla v. Kentucky*, —— U.S. ——, 130 S.Ct. 1473, 1486, 176 L.Ed.2d 284 (2010) (discussing the "severity of deportation" from the United States as "the equivalent of banishment or exile"). We agree with the Hearing Committee, which considered as an aggravating factor the potential and realized harm the immigration fraud posed to Kanu's clients.

By acknowledging the harm to Kanu's clients, we do not wish to imply that Li and Hu were entirely blameless when they paid Kanu to obtain immigration benefits based on their religious worker status. Li testified that when he told Kanu he had never worked in a church in China, she said, "you [don't] need to worry about this; they're going to take care of that, and [Kanu] said she's going to train me how to tell [the] Immigration Office, how to convince them I'm qualified for [the religious visa]." Similarly, Hu testified that he told Kanu he was not a minister and had never

---

**2.** On April 7, 2010, this court granted Kanu's motion to supplement the record with copies of two checks payable to Li and Hu, each for $1,000. Kanu's counsel wrote in an attachment to the motion that "[t]hese checks represent the first installment of Ms. Kanu's refund" to her clients. On May 12, 2010, Kanu submitted to this court copies of two additional checks in the amount of $1,000 each to Li and Hu, which she said were "second installment payment[s]" to her former clients. On September 1, 2010, this court received copies of two more checks from Kanu to Li, each in the amount of $1,000, which Kanu said were third and fourth installment payments. We do not consider Kanu's attempt to fulfill her refund obligations to Li and Hu (albeit six years after they requested their refunds) in determining the appropriate sanction for her professional transgressions, not only because it is "too little, too late," but also because our court is not in a position to determine whether the checks actually reached Li and Hu. Should Kanu eventually seek reinstatement to the Bar, the Board would be the appropriate body to consider her efforts at restitution.

worked for a church, but said that this information did not deter Kanu from promising to obtain an R–1 visa for him in three months.

But our review of the students' testimony reveals that they were unfamiliar with the immigration system and relied on Kanu's expertise and promises to successfully navigate that system and obtain green cards for them. Li testified that Kanu told him she would find a sponsor for him and that he would get his green card in about three months. When Kanu told him that she would be applying on his behalf for a religious worker visa, he thought that meant that after he got the visa, he would "need to work for the sponsor." Hu testified that "[i]nitially, [he] wonder[ed] how she [could] guarantee the approval of [a] Green Card within one year," but that Kanu assured him that she would refund the money if she could not get the green card. Hu further testified that Kanu told him that obtaining an R–1 visa was the first step to getting a green card. With that understanding, Hu told Kanu that, "it's okay, I can work for anyone; if you can get the R–1 visa, I can work for them, too." Hu's testimony demonstrates that he was willing to move and to work for anyone as long as he could get a green card.

In our view, Li's and Hu's complicity in Kanu's fraud does not diminish the harm her misconduct caused them. The Hearing Committee took Li's and Hu's apparent role in the immigration fraud into account when deciding whether Kanu or her clients were more credible, and the fact remains that Li and Hu relied on the promises and guarantees of their attorney to guide them through the immigration process and to tell them what they needed to do to obtain the visas that were the "first step" on the path to green cards.

Another aggravating factor stems from Kanu's clients' status as non-citizens, which made her misconduct difficult to detect. *See In re Cleaver–Bascombe,* 892 A.2d 396, 414 (D.C.2006) (Glickman, J., dissenting). As Bar Counsel suggests, non-citizens may be reluctant or afraid to report such misconduct for fear of being deported or because they may not know of the existence of Bar disciplinary authorities. In determining the appropriate sanction for professional misconduct, we consider the need to protect the public, the courts, and the legal profession. *See In re Reback,* 513 A.2d at 231. Viewed in this light, Kanu's conduct was a clear violation of the trust that the public and the judicial system place in lawyers. "The purpose of imposing discipline is to serve the public and professional interests identified and to deter future and similar conduct rather than to punish the attorney." *In re Cleaver–Bascombe II,* 986 A.2d at 1195 (citing *In re Kennedy,* 542 A.2d 1225, 1231 (D.C.1988) and *In re Hutchinson,* 534 A.2d 919, 924 (D.C.1987)). As we have said, "[l]awyers have a greater duty than [non-lawyers] to be scrupulously honest at all times, for honesty is basic to the practice of law." *In re Mason,* 736 A.2d 1019, 1024 (D.C.1999) (internal editing and quotation marks omitted) (quoting *In re Hutchinson,* 534 A.2d at 924).

Kanu also has vacillated in her willingness to accept responsibility for her refund obligations. Kanu testified that Li "didn't apply enough patience" while waiting for his visa to be processed, even after he had learned from the government's website that it had been denied, and that she "[did not] think that [Li] deserved to get his refund back, but [she] just made a business decision to give it back to him." At another point in the hearing, however, Kanu testified that her intention "ha[d] always been" to repay the money that Li and Hu paid her.

We also consider Kanu's foot-dragging in paying the refunds as an aggravating factor. According to Kanu, she initially put the retainer money from Li and Hu "into the general office account," although she seems to have intended that it not be used for office purchases. Nonetheless, she testified that "[w]hat had occurred was . . . at a certain point we had [the money], but at a certain point we did not have it. The money was used." Kanu admitted that in 2004, when Li and Hu first requested their refunds, she had sufficient money to repay them, but she did not honor their requests. When asked if she had been in a position to repay Li after her check to him was returned to her office as undeliverable, Kanu stated, "[y]es, we had money that was coming back and forth." [3]

Finally, as we have already stated, because of the nature of Kanu's violations and the injury to her clients, we believe that she "lacks the moral fitness to remain a member of the legal profession." *In re Cleaver–Bascombe II*, 986 A.2d at 1200–01. Our task is to impose discipline that is consistent with other cases involving comparable conduct, *see* D.C. Bar R. XI, § 9(h)(1), and we, like the Hearing Committee, deem Kanu's conduct in this case to be comparable to the conduct at issue in Cleaver–Bascombe's case. The record is rife with evidence of Kanu's lack of responsiveness and dishonesty to her clients, Bar Counsel and the Hearing Committee. Kanu made promises to Li and Hu that she knew, or should have known, she could not keep, and, as Bar Counsel puts it, when she was not able to deliver on her promises, "continued her dishonest conduct by evading and misleading [her clients]" about the refunds she owed. In addition to misleading her clients, Kanu intentionally misled Bar Counsel by saying that she had refunded money to Li when she knew that Li had never received the refund check. Even if he had received the check, she did not have sufficient funds in her account to pay the check. Dishonesty toward the institutions of this court is bad enough, but coupled with the dishonesty and evasion Kanu has demonstrated toward her clients, we equate her conduct to the dishonesty at issue in *In re Cleaver–Bascombe II*, and order that she be disbarred. [4]

### III. Conclusion

It is ordered that Anita C. Kanu is disbarred from the practice of law in the District of Columbia, effective thirty days

---

**3.** We are not unmindful that Kanu offered both her own testimony and that of a therapist in mitigation, explaining that she was suffering from emotional and personal problems. The Hearing Committee gave careful consideration to this testimony and was not unsympathetic to "the traumas [Kanu] claimed to have experienced," but it ultimately concluded that there were too many inconsistencies in her explanations to account for her professional misconduct. The Board adopted the Committee's findings, and Kanu no longer advances alleged personal problems as mitigating circumstances in her arguments to this court.

**4.** Because we find disbarment to be the appropriate sanction for Kanu's "flagrant" dishonesty, *In re Cleaver–Bascombe II*, 986 A.2d at 1199, we do not reach the issue of the applicability of *In re Addams* to her case. *See In re Bach*, 966 A.2d 350, 353 n. 7 (D.C.2009) (noting that the decision to disbar attorney because of misappropriation of funds "makes it unnecessary to consider" an additional rule violation (citing *In re Gil*, 656 A.2d 303, 304 (D.C.1995) (deciding not to reach other alleged rule violations because attorney was being disbarred for criminal conduct and dishonesty))). We note, however, that our recent decision in *In re Mance*, would suggest that Kanu's acceptance of flat fee retainers from her clients, had it occurred later in time, would have brought her within the purview of *Mance's* prospective holding that failure to segregate such fees is a violation of Rule 1.15(d).

from the date of this opinion. See D.C. Bar R. XI, § 14(f). For the purpose of seeking reinstatement to the Bar, the period of disbarment shall not be deemed to begin until Kanu files a sufficient affidavit pursuant to D.C. Bar R. XI, § 14(g). As recommended by the Board, reinstatement shall be conditioned on Kanu's paying restitution to Li in the amount of $7,000 and to Hu in the amount of $6,000, with interest at the legal rate of 6% per year calculated from January 1, 2004.

*So ordered.*