**In re Robert N. VOHRA, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 426365).**

**No. 11–BG–1607.**

District of Columbia Court of Appeals.

Argued Oct. 25, 2012.
Decided June 27, 2013.

---

Timothy J. Battle for respondent.

Catherine L. Kello, Assistant Bar Counsel, with whom Wallace E. Shipp, Jr., Bar Counsel, and Jennifer P. Lyman, Senior Assistant Bar Counsel, were on the brief, for the Office of Bar Counsel.

Before BLACKBURNE–RIGSBY and BECKWITH, Associate Judges, and BELSON, Senior Judge.

BELSON, Senior Judge:

This matter comes before us upon the Report and Recommendation of the Board on Professional Responsibility ("Board"). The Board concluded that respondent Robert N. Vohra committed thirteen violations of the Rules of Professional Conduct ("Rules" or "Rule") in a single immigration matter involving the obtaining of visas for a married couple. Respondent's misconduct included sustained neglect of his clients' matters and numerous Rule violations, some involving dishonesty. The Board unanimously recommended that respondent be suspended for three years and be required to demonstrate his fitness to practice law as a condition of his reinstatement. Respondent takes no exception to the Board's Report and Recommendation.[1] Bar Counsel takes exception only to the Board's recommended sanction, arguing that disbarment is the appropriate sanction. We cannot agree. We accept the Board's findings, agree with its conclusion that respondent committed thirteen Rule violations, and adopt its recommended sanction. Accordingly, we order that respondent be suspended for three years and be required to demonstrate his fitness to practice law as a condition of his reinstatement.

I.

The charges of disciplinary rule violations arose from respondent's representation of Mr. Jeho Choi and his spouse, Ms. You Sun Kim, ("the Chois") in a single immigration matter. After conducting its investigation, Bar Counsel charged respondent with fourteen Rule violations. Following a three-day hearing, a Hearing

---

1. Although in his initial brief to this court respondent took exception to the Board's recommended sanction, arguing that a shorter suspension with no fitness requirement is the appropriate sanction here, he abandoned that argument in his reply brief and instead asks this court to "follow the unanimous recommendation of a three year suspension with a fitness requirement made by the Hearing Committee and the Board."

Committee issued a sixty-nine page report in which it concluded there was clear and convincing evidence that respondent committed thirteen of the fourteen charged violations.[2] The Board unanimously adopted the Hearing Committee's findings of fact and agreed with its conclusions of law which, the Board noted, were "well thought out and all-inclusive." Neither respondent nor Bar Counsel takes exception to the factual findings or legal conclusions made by the Board.

■ This Court "shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record," and reviews *de novo* the Board's legal conclusions. D.C. Bar R. XI, § 9(h)(1); *In re Pierson,* 690 A.2d 941, 946–47 (D.C.1997). However, where neither respondent nor Bar Counsel takes exception to the Board's findings of fact or conclusions of law, as is the case here, this court's review of those portions of the Board's report is more deferential. *See In re Kline,* 11 A.3d 261, 263 (D.C.2011) ("As neither respondent nor Bar Counsel seriously disputes the facts found by the Hearing Committee, and respondent takes no issue with any of the violations determined

by the Board, the questions before us relate to the proper sanction."); *In re Dubow,* 729 A.2d 886, 887 (D.C.1999) (review of Board's Report and Recommendation deferential where Bar Counsel filed no exception and where respondent initially excepted but later "bypassed the opportunity to identify and brief the issues"). Our review of the record, appropriately deferential, provides us with no reason to question the Board's factual findings or its legal conclusions that respondent violated Rules 1.1(a) and (b); 1.3(a), (b)(1), (b)(2), and (c); 1.4(a) and (b); 3.3(a)(1); 8.1(a); and 8.4(b), (c), and (d). We adopt the Board's Report and Recommendation, incorporate it as an appendix to this opinion, and provide a summary of the Board's factual findings here.

In September 2004, respondent agreed to represent the Chois, who sought to obtain investment visas based on their purchase of a United Parcel Services ("UPS") store. As a precondition to their eligibility to apply for the investment visas while in the United States, the Chois were required to remain in valid immigration status. When they retained respondent, the Chois were lawfully present in the United States

---

**2.** Specifically, the Hearing Committee found that respondent violated:

Rules 1.1(a) and (b) in that respondent failed to provide competent representation to his clients; Rule 1.3(a) in that respondent failed to represent his clients zealously and diligently within the bounds of the law; Rule 1.3(b)(1) in that respondent intentionally failed to seek the lawful objectives of his client; Rule 1.3(b)(2) in that respondent intentionally prejudiced or damaged his clients during the course of the professional relationship; Rule 1.3(c) in that respondent failed to act with reasonable promptness in representing his clients; Rule 1.4(a) in that respondent failed to keep his clients reasonably informed about the status of their matter and/or promptly comply with reasonable requests for information; Rule 1.4(b) in that respondent failed to explain a matter to

the extent reasonably necessary to allow his clients to make informed decisions regarding the representation; Rule 3.3(a)(1) in that respondent knowingly made a false statement of material fact to a tribunal; Rule 8.1(a) in that respondent knowingly made a false statement of fact in connection with a disciplinary matter; Rule 8.4(b) in that respondent committed criminal acts (false statements to the United States government, immigration fraud, and/or forgery) that reflect adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer; Rule 8.4(c) in that respondent engaged in conduct involving dishonesty, fraud, deceit, and/or misrepresentation; and Rule 8.4(d) in that respondent engaged in conduct that seriously interferes with the administration of justice.

based on Mr. Choi's earlier-acquired work visa and a corresponding visa for his spouse. These visas were due to expire on June 1, 2005.

In January 2005, respondent filed the Chois' applications for investment visas using an incorrect form. As a result, these applications were rejected and returned to respondent's office by February 2005. Respondent never advised the Chois that their visa applications had been rejected but, instead, allowed the Chois to continue under the false belief that their original applications were still under review. In the meantime, the Chois' earlier-acquired visas expired on June 1, 2005.

In late November 2005, ten months after the incorrectly-filed visa applications were rejected and over five months after the Chois' earlier-acquired visas had expired, respondent resubmitted the visa applications, this time using the correct form, to the United States Citizenship and Immigration Services ("USCIS"). Respondent chose not to inform his clients of the re-filing, and therefore signed the Chois' names on the applications without their knowledge or authorization. He did so despite the requirement that applicants must personally certify to the correctness of the application under penalty of perjury and despite the absence of any statute or regulation authorizing persons other than applicants to sign the required certifications.

Shortly after re-filing the visa applications, respondent received notice from USCIS that it required additional documentation to complete the visa processing, but he failed to notify the Chois of this USCIS action. Respondent did belatedly ask for some, but not all, of the required documentation, which the Chois immediately provided. On January 13, 2006, USCIS denied the resubmitted visa applications based on, *inter alia,* lack of documentation establishing the source of the funds used by the Chois to purchase the UPS store. Respondent continued to misrepresent to the Chois that their visa applications were pending.

By June 2006, unbeknownst to them, the Chois had been without valid visas for over a year. Concerned about the status of his visa request and the lack of updates from respondent, Mr. Choi contacted USCIS on his own and learned for the first time that the visa applications had been denied five months earlier. Thereafter, when Mr. Choi confronted respondent with this information, respondent told Mr. Choi that he "had filed a motion to reopen and reconsider upon receiving the denial, and that [he] still expected approval." In fact, respondent had submitted no such motion.

Having lost confidence in respondent—who admitted that in taking on this matter he was in "way over his head"—the Chois hired new immigration counsel. Through successor counsel, the Chois filed new visa applications with supporting documentation explaining the late filing and seeking *nunc pro tunc* relief. This supporting documentation included a signed affidavit in which respondent admitted that he had originally filed the wrong forms, failed to request appropriate documentation to support the second filing, and made repeated misrepresentations to the Chois regarding the status of their applications.[3] Although

---

3. Although the Board found that respondent made many truthful statements in his signed affidavit, it noted that respondent later "stepped off the straight and true path repeatedly" through subsequent misrepresentations he made to Bar Counsel and to the Hearing Committee. They included his misrepresentation to Bar Counsel that the delay in filing the visa applications was caused by the *Chois'* inability to get all of the documents required to support their application, as well as respondent's misrepresentations to both

respondent refunded his $5,000 legal fee to the Chois, they paid successor counsel over $9,000 in attorney's and filing fees for the more involved work required to persuade USCIS to reconsider their visa applications. Fortunately for the Chois, successor counsel's efforts succeeded in obtaining retroactive visa status for them.

## II.

 We turn now to a discussion of the appropriate sanction. "A sanction recommendation from the Board comes to us with a strong presumption in favor of its imposition." *In re Silva*, 29 A.3d 924, 926–27 (D.C.2011) (internal quotation marks and citation omitted). Our Rules provide that this Court "shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar R. XI, § 9(h)(1).

> This Rule endorses the Board's exercise of broad discretion in handing out discipline that is subject only to a general review for abuse in that discretion's exercise. The rule requires that we enforce a general sense of equality in the sanctions handed out, but it otherwise commands that we should respect the Board's sense of equity in these matters unless that exercise of judgment proves to be unreasonable.

*Silva, supra,* 29 A.3d at 927 (citations omitted). "Thus, [g]enerally speaking, if the Board's recommended sanction falls within a wide range of acceptable outcomes, it will be adopted and imposed." *Id.* (internal quotation marks and citation omitted).

---

Bar Counsel and the Hearing Committee that he had the Chois' authorization to sign their

In arriving at its recommendation, the Board carefully considered respondent's violations in light of all the relevant factors which this court has identified in previous bar discipline cases. *See, e.g., In re Hutchinson,* 534 A.2d 919, 924 (D.C.1987) (en banc). These factors included: (1) the nature and seriousness of the misconduct; (2) prior discipline; (3) prejudice to the client; (4) the respondent's attitude; (5) circumstances in mitigation and aggravation; and (6) the mandate to achieve consistency. See Appendix.

██ As the Board stated in its Report and Recommendation, sanctions for neglect of one or two immigration matters with attendant dishonesty start as low as a thirty-day suspension and range as high as disbarment. *See, e.g., In re Cole,* 967 A.2d 1264 (D.C.2009) (thirty-day suspension where respondent neglected his client's asylum application, falsely assured his client that the application had been filed, and falsely explained that the delay was attributable to the court); *In re Kanu,* 5 A.3d 1 (D.C.2010) (disbarment where respondent counseled her clients to provide false information on visa applications, failed to tell clients that their application had been denied, evaded their inquiries, and lied to them and Bar Counsel about refunding fees). Here, the Board focused on four cases in which we imposed sanctions ranging from a two-year suspension with a fitness requirement to a three-year suspension with—or in one case without—a fitness requirement for attorney misconduct that was in some instances more serious and in others less serious than respondent's misconduct. *See Silva, supra,* 29 A.3d 924 (three-year suspension with fitness requirement when attorney falsely notarized signature on easement agree-

names to their visa applications.

ment, falsely stated that he had recorded it, and misrepresented facts to Bar Counsel and Hearing Committee); *Kline, supra*, 11 A.3d 261 (three-year suspension *without* fitness requirement where attorney misled client and forged signature, but acted out of weakness, not malice, and without vile or predatory motive); *In re Slaughter*, 929 A.2d 433 (D.C.2007) (three-year suspension with fitness requirement where attorney elaborately falsified attorney-client relationship with the state of Arkansas for his personal benefit as attorney); *In re Ukwu*, 926 A.2d 1106 (D.C. 2007) (two-year suspension with fitness requirement where immigration attorney was neglectful in five immigration matters, dishonest regarding receipt of fee in one, testified falsely to Hearing Committee, misrepresented to Board of Immigration Appeals, and counseled client to submit falsified immigration documents). We conclude that the Board's recommended sanction of a three-year suspension and fitness requirement falls within the acceptable range of outcomes.

Bar Counsel suggests that our refusal to construe respondent's dishonesty as the "flagrant" kind that warrants disbarment would undermine our decisions in *In re Kanu, supra, In re Cleaver-Bascombe*, 986 A.2d 1191 (D.C.2010) ("*Cleaver-Bascombe II*"), and *In re Howes*, 52 A.3d 1 (D.C. 2012). We cannot agree. Respondent's misconduct was not as serious as that of the respondents in those cases. Unlike Ms. Kanu, respondent was not systematically abetting clients in fraudulently applying for visas to which they clearly were not entitled. Moreover, respondent fully refunded his retainer fee to the Chois, whereas Ms. Kanu withheld funds from her clients and then lied to them about the status of her efforts to repay them. *Kanu, supra*, 5 A.3d at 15. It follows that respondent's misconduct did not come as "dangerously close to misappropriation" as

did the misconduct of Ms. Kanu and, thus, is distinguishable from the kind of "flagrant dishonesty" present in *Kanu. Id.* at 14, 17 n. 4. Similarly, in contrast to the "flagrant dishonesty" of Mr. Howes and Ms. Cleaver-Bascombe, respondent was not systematically misusing public funds, *Howes, supra*, 52 A.3d at 17–18, or attempting to misappropriate public funds. *Cleaver-Bascombe II, supra*, 986 A.2d at 1199.

Nor is respondent's misconduct comparable to that of the immigration attorney we disbarred in *In re Omwenga*, 49 A.3d 1235 (D.C.2012). Bar Counsel states in its letter to this court, submitted pursuant to D.C.App. R. 28(k), that our decision in *Omwenga* "bears directly" on its argument that we should disbar respondent, but we are not persuaded that the sanction of disbarment imposed for the more serious and pervasive misconduct in *Omwenga* is precedent for imposing disbarment here. *Omwenga* involved the misconduct of an attorney in one matter involving the purchase of a business and three consolidated immigration matters, and was marked by intentional misappropriation in one matter and "flagrant dishonesty" in all four. 49 A.3d at 1236. Relying on *Howes, supra*, and *Cleaver-Bascombe II, supra*, we held that "[e]ven absent evidence of intentional misappropriation, disbarment is warranted in this case based on respondent's other serious and pervasive misconduct alone, particularly his flagrant dishonesty." *Omwenga, supra*, 49 A.3d at 1238. In determining the appropriate sanction for Mr. Omwenga, we emphasized, *inter alia*, the egregiousness of Mr. Omwenga's misconduct as well as the absence of mitigating factors and presence of aggravating factors. *Id.* at 1239. In addition to his repeated dishonesty in dealing with his clients, the courts, Bar Counsel, and the Committee, Mr. Omwenga also refused to

take responsibility in any of the four client matters, exhibited no regret or remorse, and possessed a history of prior discipline in three unrelated client matters involving "strikingly similar" misconduct. *Id.* at 1239 (internal quotation marks and citation omitted).

In contrast, respondent's misconduct is less serious than that of Mr. Omwenga. Most significantly, whereas Mr. Omwenga was culpably indifferent to the interests of his clients and refused to take responsibility for his actions, respondent at a critical time took full responsibility for his failures in his signed affidavit and took part in the Chois' subsequent attempt, through successor counsel, to obtain their visas. While his attitude has fluctuated,[4] respondent was, at least initially, remorseful for his failures and refunded his $5,000 legal fee to the Chois. This was not true of Mr. Omwenga. Moreover, respondent's misconduct was not as pervasive as Mr. Omwenga's misconduct, which involved one instance of misappropriation and three immigration matters, as well as a history of similar misconduct in three unrelated matters, while respondent's misconduct took place in a single immigration matter, and only one instance of similar misconduct appears in his prior disciplinary history. In light of these distinctions, we do not equate respondent's dishonesty to the "flagrant" kind exhibited by Mr. Omwenga.

The Board's conclusion that respondent's dishonesty, like that of the respondent in *Kline, supra,* was not grounded in

malice affords further reason for not disbarring respondent.

Based on all the circumstances, we are not persuaded that we should depart from the Board's carefully explained recommendation that respondent should be suspended for three years, with a fitness requirement.

## III.

For the reasons set forth above, Robert N. Vohra is suspended from the practice of law in the District of Columbia for three years, effective from the date on which he filed, or files, the affidavit required by D.C. Bar R. XI, § 14(g), and subject to the requirement that he demonstrate his fitness to resume the practice of law as a condition of his reinstatement.

*So ordered.*

### *Appendix*

### DISTRICT OF COLUMBIA COURT OF APPEALS BOARD ON PROFESSIONAL RESPONSIBILITY

In the Matter of: ROBERT N. VOHRA, Respondent.

A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 426365)

(Bar Registration No. 426365)

---

4. Although respondent initially acknowledged his wrongdoings in his signed affidavit, which was instrumental to the Chois' eventually obtaining their visas, his attitude altered dramatically once Bar Counsel began its investigation. For example, respondent misrepresented to Bar Counsel that the *Chois* were to blame for the delay in filing the visa applications and argued in his brief to the Board that there was no need for any sanction or penalty because he had not committed any ethical violations whatsoever. Respondent displayed a similar attitude in his initial brief to this court, in which he notes, among other things, that he finds it "significant [that the Hearing Committee's Report included] absolutely no criticism of Mr. Choi" and that Mr. Choi was to blame for the "source of funds" issue with the visa applications. Respondent's attitude appears to improve in his reply brief, where he states that he is remorseful and apologetic.

 

## REPORT AND RECOMMENDATION OF THE BOARD ON PROFESSIONAL RESPONSIBILITY

### I. INTRODUCTION

Respondent has filed exceptions to the findings of fact, conclusions of law and recommended sanction in the Hearing Committee's Report and Recommendation ("H.C.Rpt.")[1] dated August 9, 2011. Bar Counsel's only exception is to the recommended sanction. This disciplinary matter arises over Respondent's representation of Mr. Jeho Choi and his spouse (You Sun Kim) (the "Chois") in an immigration matter. The Committee has concluded that Bar Counsel proved multiple violations of the D.C. Rules of Professional Conduct, finding "sustained neglect" of Respondent's clients' matters and "multiple violations of Rule 8.4(c) prohibiting dishonest conduct." H.C. Rpt. at 59. Of the charges brought against Respondent, the Committee found only one not proven: Rule 5.5(a) (engaging in the unauthorized practice of law).[2] The Board agrees with the Committee's conclusions of law and recommended sanction—a three-year suspension with a requirement to prove fitness as a condition of reinstatement.

### II. PROCEDURAL HISTORY

On April 6, 2010, Bar Counsel filed a Specification of Charges against Respondent, alleging fourteen violations: Rules 1.1(a) and (b) (competence, skill and care); Rule 1.3(a) (zeal and diligence); Rule 1.3(b)(1) (intentional failure to seek clients' lawful objectives); Rule 1.3(b)(2) (intentional prejudice to clients); Rule 1.3(c) (failure to act with reasonable promptness); Rule 1.4(a) (failure to keep client reasonably informed); Rule 1.4(b) (failure to explain matter to extent reasonably necessary to allow clients to make informed decisions); Rule 3.3(a)(1) (knowing false statement of material fact to a tribunal); Rule 5.5(a) (unauthorized practice of law); Rule 8.1(a) (knowing false statement of fact in connection with a disciplinary matter); Rule 8.4(b) (commission of a criminal act that reflects adversely on the lawyer's honesty, truthfulness, or fitness as a lawyer); Rule 8.4(c) (dishonesty, fraud, deceit, or misrepresentation); and Rule 8.4(d) (serious interference with administration of justice).

Respondent filed his Answer on May 3, 2010, through counsel, denying any violation of the ethical rules. The Committee held three days of evidentiary hearings on April 7–8, and 11, 2011. Bar Counsel called four witnesses, including Respondent, who also testified in his own case along with one other witness. At the conclusion of the evidentiary phase of the hearing, the Committee made a preliminary, nonbinding determination that Bar Counsel had sustained its burden with respect to at least one of the charged violations. Bar Counsel offered four exhibits in aggravation relating to two prior instances of discipline of Respondent. The Committee filed its 69–page Report on August 9, 2011. Respondent filed a brief in support of his exceptions to the Hearing Committee report on September 19, 2011. Bar Counsel filed a brief in opposition to Respondent's exceptions and in support of Bar Counsel's limited exception to the Committee's recommended sanction on Oc-

---

1. "FF" refers to the Hearing Committee's numbered findings of fact. "BX" refers to Bar Counsel's exhibits. "Tr." refers to the transcript of the hearing.

2. Bar Counsel has taken no exception to this finding. Upon independent review of the record, the Board concurs with the Hearing Committee's finding that Bar Counsel has failed to prove a violation of Rule 5.5(a).

tober 11, 2011. Oral argument before the Board was held on October 27, 2011.

## III. *FINDINGS OF FACT*

In his brief to the Board, Respondent notes his objection to the "findings of fact, conclusions of law and proposed sanction" of the Committee. Respondent's Brief ("R.Brief") at 1. A Hearing Committee's findings of fact and assessments of credibility will be accepted by the Board when supported by "substantial evidence on the record as a whole." Board Rule 13.7; *In re Micheel,* 610 A.2d 231, 234 (D.C.1992). Following a review of the record, the briefs of both parties and oral argument, the Board adopts the findings of fact of the Committee as fully supported by substantial record evidence. Set forth below are the salient facts with cites to the Committee's findings.

### 1. *Representation of the Chois*

Respondent became a member of the District of Columbia Bar on December 31, 1990. FF 1. On September 30, 2004, he agreed to represent Mr. and Mrs. Choi in obtaining E–2 visas based on their investment in a UPS store in Arlington, Virginia.[3] Mr. Lawrence Sizemore, a member of the Virginia Bar, had originally agreed to handle the Chois' legal work, including both the purchase of the UPS outlet and their E–2 visa applications. FF 4. Due to timing conflicts, Sizemore asked Respondent to attend the settlement on the UPS store and handle the E–2 visa matter. FF 11–12. Sizemore did the paper work on the purchase of the UPS store. FF 4. The Chois were lawfully present in the United States at this time—Mr. Choi on an H1–B1 visa[4] and Mrs. Choi on an H4 visa.[5] FF 7. Both visas ran through June 1, 2005. *Id.*

In January 2005, Respondent filed E–2 visa applications for the Chois on an incorrect form (DS–156). FF 16, 19. As a result, the E–2 applications "were rejected and returned to Respondent's office in February 2005." FF 21. Respondent never advised the Chois that their visa applications had been rejected, although from February to November 2005, Mr. Choi "frequently contacted" Respondent's office. FF 23. Finally, in late November 2005 (ten months after the initial applications were rejected), Respondent resubmitted to USCIS[6] the correct E–2 visa applications (Forms I–129 and I–539). FF 32. In the interim, the Chois' H1–B1/H4 visas expired on June 1, 2005. FF 7. The Hearing Committee further found:

> Respondent knew that as of June 1, 2005, the Chois' H1–B1/H4 visa status expired . . . and there was no application pending for the Chois to obtain E–2 visa status. . . . The Chois' remaining in valid H1–B1/H4 visa status was a precondition of their eligibility to apply for E–2 visas while in the United States. . . . Lapse of the Chois' H1–B1/H4 visas status also had other potentially significant

---

3. An E–2 visa is issued to a non-United States citizen who proposes to make a substantial investment from abroad into a United States business, and allows the non-United States citizen to remain in this country to work in that business. FF 8.

4. H1–B1 visas are issued to non-United States citizens who possess a high degree of skill or education. FF 8. H1–B1 visa holders are permitted to work in the United States. *Id.*

5. H4 visas are issued to close family members of holders of H1–B1 visas. FF 8.

6. United States Citizenship and Immigration Service, a part of the Department of Homeland Security.

adverse immigration and practical consequences for them. FF 28–30.

Respondent did not inform his clients that he had resubmitted their E–2 visa filings. FF 34. The Chois continued under the false belief that their original January 2005 filings were still under review. To keep the re-filing confidential from his clients, Respondent signed their names, without their knowledge or authorization. FF 35. The Chois had signed the initial E–2 forms and "Mr. Choi testified forcefully and credibly" that they would have signed any further forms. FF 37.

With regard to the second application, the Committee found that:

Forms I–129 and I–539 require the applicant personally to certify under the penalties for perjury to the correctness of the application.... No statute or regulation authorizes a person other than the applicant to sign the required certifications on Forms I–129 and I–539.

FF 38–39.

Respondent testified that he had received verbal authorization from Mr. Choi to sign the Chois' names. Tr. at 712. The Committee did not credit this testimony, but instead found that Respondent had "lied" to the Committee. FF 97. Further, Respondent had "disguised the signatures so that they would not look like" his handwriting. FF 35. Respondent put no initials or other indication that he was signing on behalf of his clients. *Id.* A week or two after he filed the new E–2 forms, Respondent, on December 8, 2005, received notice from the USCIS that additional documentation was required to complete the visa processing. FF 42. The Chois received no notice of this USCIS action. FF 43. Respondent did belatedly ask for "some, but not all," of the required

documentary information, which his clients "immediately provided." FF 45–46. Respondent then submitted additional documents to the USCIS, but without informing the Chois. FF 50–51.

These resubmitted E–2 visa applications were denied on January 13, 2006. FF 52. Mrs. Choi's application was denied, "*inter alia,* because documentation was not supplied establishing that the purchase funds had been paid to the seller of the UPS store ... and because documentation was not supplied establishing the source of the funds invested in the United States." FF 53. Consequently, Mr. Choi's E–2 visa application, which was dependent on Mrs. Choi's application, was denied as well. FF 54. Notice of this rejection was not given by Respondent to the Chois until five to six months later, after Mr. Choi had contacted the USCIS on his own. FF 56, 67. By then, Mr. Choi and his wife had been without a valid visa for over a year, unbeknownst to them. FF 71. Respondent did submit a letter to USCIS on February 5, 2006, purporting to be a reconsideration request. FF 59. It was not, however, a proper motion for such relief and never elicited a response. FF 63–64. Further, Respondent never inquired of the USCIS as to the status of his letter. FF 64. "From January to June of 2006, Respondent continued to misrepresent to the Chois that their E–2 visa applications were pending...." FF 65.

The Committee found that Respondent's "pattern of deception" over the status of the Chois' visa requests had commenced in January 2005 and continued through June 2006. FF 24. Respondent at one point had shown the Chois a proposed draft letter dated November 4, 2005, for submission to the USCIS inquiring "when we may expect the processing of this application to be completed...." FF 25. At that time, there was no visa application

pending—the January 2005 application having been rejected in February 2005. FF 21. Similarly, in an April 7, 2006, email to Mr. Sizemore and Mr. Choi, Respondent stated, "I have confirmed with the INS Mr. Choi's application is ready for approval...." FF 65. Since the Chois' resubmitted applications had been denied on January 13, 2006, this was also a misrepresentation. FF 52.

Being concerned about the status of his visa request and the lack of updates from Respondent, Mr. Choi made an "Infopass"[7] appointment with USCIS in June 2006. FF 66. At that meeting, Mr. Choi "learned for the first time that the Chois' E–2 visa applications had been denied ... five months earlier." FF 67. After the "Infopass" meeting with USCIS,

> Mr. Choi met with Respondent to discuss the Chois' visa situation.... Respondent admits that he lied to Mr. Choi at that meeting about the status of the Chois' E–2 visa applications: "I told him that I had filed a motion to reopen and reconsider upon receiving the denial, and that I still expected approval. No such motion had been submitted."

FF 68.

### 2. Retention of New Immigration Counsel

Having lost confidence in Respondent, Mr. Choi hired new immigration counsel (Glen Wasserstein) in July 2006. FF 69–

70. The information Mr. Choi received at his "Infopass meeting ... left him stunned, shaking, and unable to think." FF 71. "Mr. Choi had put the life savings of his family into the purchase of the UPS store...." Id. Prior to retaining Mr. Wasserstein, Mr. Choi "had already been told by one other possible replacement counsel" that his situation "was hopeless." FF 72. By mid- to late-August, Wasserstein had filed new E–2 visa applications for the Chois, along with supporting papers explaining the late filing and seeking retroactive (nunc pro tunc) relief. These papers included a signed affidavit from Respondent (BX 1 at 30–33), dated August 9, 2006 ("signed affidavit"),[8] in which Respondent admitted that he had originally filed the wrong form relative to the Chois' E–2 visa applications, failed to request appropriate documentation to support the second filing, and made "repeated misrepresentations" to the Chois regarding the status of their applications. FF 85–86; BX 1 at 30, ¶ 3; BX 1 at 31, ¶¶ 5–6; BX 1 at 32, ¶¶ 10–12, 13, 15–16. Wasserstein and Respondent jointly drafted this affidavit. FF 75. Wasserstein's efforts succeeded in obtaining retroactive E–2 visa status for the Chois. FF 88.

Respondent refunded to the Chois his $5,000 legal fee. FF 83. For the more involved work required of successor counsel in having the USCIS reconsider the Chois' applications, the Chois paid Wasser-

---

7. According to USCIS, "InfoPass is a free service that lets you schedule an appointment with a U.S. Citizenship and Immigration Services (USCIS) Immigration Officer by using the Internet at any time of day or night." See http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=f183bd85ef149210VgnVCM100000082ca60aRCRD & vgnextchannel=f183bd85ef149210VgnVCM100000082ca60aRCRD.

8. Bar Counsel's exhibits also include an unsigned affidavit dated August 3, 2006 ("draft affidavit"). BX 2 at 56–57. Respondent drafted this prior version and sent it to Mr. Wasserstein for his comments. Mr. Wasserstein then made changes to the document and sent it back to Respondent. BX 15. Respondent "made virtually no changes in Mr. Wasserstein's revision of Respondent's affidavit" before signing the affidavit and having it notarized. FF 76.

stein $8,000–$10,000. Also, the filing fee of $1,185 was "much higher" than the original fee when Respondent first applied. FF 90. In addition, Mr. Wasserstein testified that, in his expert opinion:

Respondent did not represent the Chois with the skill and care that lawyers practicing immigration law generally afford their clients, and in that representation Respondent displayed gross negligence and recklessness.

FF 93.

### 3. Bar Counsel's Investigation and Proceedings Before the Hearing Committee

The Hearing Committee found that Respondent made many truthful statements in his August 9, 2006, signed affidavit, prepared in support of the Chois' reapplication for E–2 visas *nunc pro tunc*. FF 95–96, 98–101. We find substantial evidence in the record to support these findings. However, in Respondent's subsequent responses to Bar Counsel's investigation, and in his testimony before the Committee, he stepped off the straight and true path repeatedly. These are catalogued by the Committee in FF 94–101. In summary:

(1) In his Initial Response to Bar Counsel's investigation (BX 2 at 45–72), Respondent alleged that "Mr. Choi falsely stated that he was in good standing when he engaged Mr. Vohra to obtain his E–2 Visa." BX 2 at 46. Under cross-examination before the Committee, Respondent admitted this charge against his client was untrue. FF 94.

(2) In Respondent's draft affidavit of August 3, 2006 (BX 2 at 56–57) ("draft affidavit"), which he confirmed as true in his testimony, he admitted that "at no time [during the period December 2004 through November 29, 2005] or subse-

quently" did the Chois "know they were out of status as I represented to them the applications had been filed and I expected approval to follow shortly." BX 2 at 56. Further, in the same draft affidavit, Respondent stated, "the applicants ... at all times, thought they were in status." BX 2 at 57. Yet, in his subsequent March 22, 2007, Supplemental Response to Bar Counsel ("Supplemental Response"), Respondent stated that "[t]he Chois *did know* they were out of status in early 2006. . . ." BX 5 at 90 (emphasis added). The Committee found this more recent "self-serving attempt" by Respondent to explain his conduct to Bar Counsel to be non-credible and misrepresentative of the facts. FF 95.

(3) In Respondent's August 9, 2006, signed affidavit, he states that "[he] took no action to file a valid E–2 petition prior to the expiration of [the Chois'] non-immigrant visa status [on June 1, 2005]." Respondent further admitted in his testimony that the delay in filing for an E–2 visa prior to November 2005, was his own fault. FF 96. Yet, in Respondent's March 22, 2007, Supplemental Response, he stated that the delay in his filing a timely E–2 visa application "was caused by the clients' inability to get all the documents required to support their application." BX 5 at 92. The Committee found Respondent's response to Bar Counsel to be a misrepresentation. FF 96.

(4) In his signed affidavit, Respondent admitted that he "did not notify" the Chois that a USCIS Request for Additional Information dated December 8, 2005, had been issued. BX 5 at 92. Yet, Respondent stated to Bar Counsel in his Supplemental Response that indeed he had "advised Mr. and Mrs. Choi of the notice." BX 5 at 93. Again, the

Committee placed more credence in Respondent's sworn affidavit than his "subsequent self-serving attempt to explain his conduct to Bar Counsel." FF 98. The Committee also found Mr. Choi's contrary testimony to be "clear and credible," and concluded that the statement in the Supplemental Response constituted a misrepresentation. FF 98.

(5) In his signed affidavit, Respondent stated that, after Mr. Choi's "Infopass" meeting, "Mr. Choi immediately came to my office requesting an explanation. I told him that I had filed a motion to reopen and reconsider upon receiving the denial. . . . No such motion had been submitted." BX 1 at 32. In his Supplemental Response to Bar Counsel, however, Respondent, through counsel, again misrepresented the facts, stating that "[Respondent] did not represent [to Mr. Choi] that a motion to reopen or reconsider had been filed." BX 5 at 96. The Committee found Respondent's signed affidavit to be more credible and that Respondent had misrepresented the true facts to Bar Counsel. FF 99.

(6) In his signed affidavit, Respondent affirmed that the initial E–2 visa applications were rejected and returned to his office in early February 2005. BX 1 at 30, ¶ 3. Respondent further admitted that he did not resubmit the applications after their initial rejection until November 2005. *Id.* at 31, ¶ 7. Yet, Respondent stated to Bar Counsel in his Supplemental Response that "a petition . . . was pending before June 2005 [when the Chois' valid visas expired]." BX 5 at 97. On cross-examination, Respondent conceded that, when the Chois' visas expired on June 1, 2005, no application was pending to obtain E–2 visa status for them. Tr. at 809–10; FF 100. The Committee thus found Respondent's

statement in his Supplemental Response that an E–2 visa petition was pending before June 2005 to be a misrepresentation. FF 100.

(7) Respondent represented to Bar Counsel in his March 22, 2007, Supplemental Response that his failure to file a timely motion to reconsider the USCIS' January 2006 denial of the Chois' visa applications was because Mr. Choi had not provided the required documents. BX 5 at 100. Again, this assertion was contrary to a statement Respondent made in his signed affidavit: "I failed to properly file a motion . . . after receiving additional documentation which clearly supported [the Chois'] application. . . ." BX 1 at 32. Respondent on cross-examination further admitted that Mr. Choi "provided me every document that I requested." Tr. at 799. The Committee found that Respondent's statement in his Supplemental Response that his failure to file a timely motion to reconsider was due to Mr. Choi's failure to provide supporting documentation constituted a misrepresentation. FF 101.

(8) Respondent represented to Bar Counsel in his March 22, 2007, Supplemental Response that, when he signed the names of Mr. and Mrs. Choi to their November 2005 visa applications, he had their authorization to do so and, further, that the Chois were "well aware the application was being filed." BX 5 at 92. Respondent testified on direct to the same effect. Tr. at 712–13; FF 97. The Committee found that the above statements constituted "lie[s]" by Respondent—both to the Committee and to Bar Counsel. FF 97. In making this finding, the Committee pointed to the "strength and credibility" of Mr. Choi's contrary testimony, Mr. Chois' contemporaneous affidavit, and the lack of support for Respondent's "bare and self-

serving claim ... of verbal authorization." FF 97. Indeed, in his own draft affidavit, Respondent "never asserted he had received verbal authorization" to sign for his clients. FF 97. Also, Respondent stated in his signed affidavit that the Chois were "unaware" that this new petition was being filed. BX 1 at 31, ¶ 8; FF 34.

## IV. CONCLUSIONS OF LAW

We have reviewed the analysis of Rules violations contained in the Committee's Conclusions of Law, and find them well thought out and all-inclusive.

A. *Failure to Provide Competent Representation, Skill and Care (Rules 1.1(a) and (b)); Failure to Represent Zealously and Diligently (Rule 1.3(a)); Failure to Act With Reasonable Promptness (Rule 1.3(c)); Failure to Keep Clients Reasonably Informed (Rule 1.4(a)); and Failure to Explain Matter to Client (Rule 1.4(b))*

Rule 1.1(a) provides that "[a] lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." Rule 1.1(b) requires an attorney to "serve a client with skill and care commensurate with that generally afforded to clients by other lawyers in similar matters." Rule 1.3(a) states that an attorney must represent his or her client "zealously and diligently within the bounds of the law." Rule 1.3(c) requires an attorney to "act with reasonable promptness in representing a client." Rule 1.4(a) provides that "[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for informa-

tion." Finally, Rule 1.4(b) requires an attorney "to explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

The evidentiary record is replete with evidence of Respondent's violations of these Rules covering neglect; competent representation, skill and care; and client communication: (a) Respondent's initial filing of E–2 visas "on the wrong forms and in the wrong place," (b) Respondent's failure to timely re-file before the Chois' H1–B1/H4 visas expired, (c) Respondent's failure to cure the deficiencies in the November 2005 filing upon notification of those deficiencies, (d) Respondent's failure after the January 2005 rejection to file a proper motion to reopen, (e) his delay of approximately nine months after the incorrect E–2 applications were returned in February 2005, before re-filing, and (f) his continuous and flagrant failure "to keep his clients informed of the status of their E–2" visa status. H.C. Rpt. at 33–41. Respondent's representation of his clients was neither technically competent, nor thorough or knowledgeable. Further, Respondent "failed to serve [the Chois] with skill and care commensurate with that generally afforded to clients by other lawyers in similar matters." H.C. Rpt. at 33. The Board agrees with the Committee that, by clear and convincing evidence, Bar Counsel has proven violations of Rules 1.1(a) and (b), 1.3(a) and (c), and 1.4(a) and (b).

B. *Intentional Failure to Seek Client's Lawful Objectives (Rule 1.3(b)(1)); Intentional Prejudice or Damage to Client (Rule 1.3(b)(2))*

Rules 1.3(b)(1) and (2) provide that "[a] lawyer shall not intentionally: (1) Fail to seek the lawful objectives of a client through reasonably available means permitted by law and the disciplinary rules;

or (2) Prejudice or damage a client during the course of the professional relationship." Neglect of a client's matter, often through procrastination, can "ripen into . . . intentional" neglect in violation of Rule 1.3(b) "when the lawyer is aware of his neglect" but nonetheless continues to neglect the client's matter. *In re Ukwu,* 926 A.2d 1106, 1116 (D.C.2007) (quoting *In re Mance,* 869 A.2d 339, 341 n. 2 (D.C.2005) (per curiam)). As the Hearing Committee found:

> Respondent was aware that the Chois' [H1–B1/H4] visa status expired on June 1, 2005, but he failed to have visa applications for them on file before that date. . . . The notices Respondent received from USCIS dated December 8, 2005, . . . made Respondent . . . aware of the requirements needed to cure the deficiencies in the Chois' E–2 visa applications filed in November 2005 . . . but, . . . Respondent failed [to correct the deficiencies]. The denial notices Respondent received from USCIS dated January 13, 2006 . . . made Respondent . . . aware of the requirements and time limits that needed to be met . . . but, . . . Respondent failed to file proper motions to reopen or reconsider the denials. All of this inaction by Respondent coexisted with his awareness of his obligation to his clients, and therefore ripened into intentional neglect. . . .

H.C. Rpt. at 36–37.

The delay and procrastination by Respondent seriously prejudiced the Chois. But for the successful legal steps taken by successor counsel (Mr. Wasserstein) in 2006, the Chois would have been barred from seeking permanent resident status for a substantial period of time. FF 92.

Also, as found by the Committee, the Chois felt real agony as they sought treaty investor status "to which they [we]re clearly entitled" and which was seriously delayed by Respondent's intentional neglect. H.C. Rpt. at 39. The Chois also experienced added and unnecessary legal and filing fees, as well as Mr. Chois' "inability to seek ancillary employment while waiting for his E–2 visa status to be obtained." *Id.* "All of these very real harms that Respondent's knowing inaction" caused are magnified by "the steps he took to conceal his actions." *Id.* The Board agrees with the Committee's conclusion that Bar Counsel established, by clear and convincing evidence, intentional neglect in violation of Rules 1.3(b)(1) and (2).

### C. *Knowing False Statement of Material Fact to a Tribunal (Rule 3.3(a)(1))*

■ Rule 3.3(a)(1) provides that "[a] lawyer shall not knowingly . . . [m]ake a false statement of material fact or law to a tribunal. . . ." [9] The Committee has found by clear and convincing evidence that Respondent "knowingly submitt[ed] forged signatures on the Chois' visa applications to USCIS." H.C. Rpt. at 43. The Chois did not authorize these signatures nor were they even aware that Respondent was doing so. FF 34–36. Respondent went to lengths to "disguise[ ]" the signatures he placed on the visa forms "so that they would not look like [his] handwriting" and omitted any initials after the false signatures to alert others that he was signing on behalf of the Chois. FF 35. The Board agrees that this conduct constitutes a knowing false statement of material fact to a tribunal.

---

**9.** This was the wording of Rule 3.3(a)(1) at the time of Respondent's misconduct. The current version of Rule 3.3(a)(1) does not contain the word "material." *See* H.C. Rpt. at 42 n. 5.

As correctly analyzed in the Committee's Report (H.C. Rpt. at 42–44), the USCIS is a tribunal within the meaning of Rule 3.3(a)(1). *See Ukwu*, 926 A.2d at 1140–41 (appended Board Report) (attorney's misrepresentations to the INS (Immigration and Naturalization Service) violated Rule 3.3(a)(1)). Here, Respondent knowingly falsified signatures on a visa application seeking a benefit (an official United States visa) from a government entity authorized to process and grant or deny such applications. Further, the visa applications (I–129 or I–539 for E–2 visa) require the applicant to personally certify under penalties of perjury the accuracy of the application. BX 11 at 182, 186; FF 38. No statute or regulation authorizes a person other than the applicant to sign these immigration documents. FF 39.

D. *Knowing False Statement of Fact in Connection With a Disciplinary Matter (Rule 8.1(a))*

Rule 8.1(a) provides that " . . . a lawyer in connection with a . . . disciplinary matter, shall not . . . [k]knowingly make a false statement of fact." [10] As summarized in our Findings of Fact, the Committee found numerous misrepresentations by Respondent in the underlying disciplinary investigation and hearing: [11] (a) Respondent's initial response to Bar Counsel falsely reported what Mr. Choi had stated to Respondent regarding Mr. Choi's immigration status, FF 94; (b) Respondent's

Supplemental Response falsely placed the blame on the Chois for Respondent's tardiness in filing proper E–2 visa applications, FF 96; (c) Respondent's Supplemental Response falsely denied that Respondent had lied to Mr. Choi by stating that a motion to reconsider the USCIS denial of the E–2 visa was already on file, FF 99; (d) Respondent's Supplemental Response falsely stated that a petition for E–2 visas for the Chois was pending before June 2005 (the date their H1–B1/H4 visas expired), FF 100; and (e) Respondent's Supplemental Response falsely ascribes to the Chois Respondent's failure to file a timely motion to reconsider. FF 101. *See* H.C. Rpt. at 47–48.

Each of these false statements was knowingly made by Respondent, as catalogued in the Findings of Fact. The Committee found each one to be a misrepresentation. The Board agrees.

E. *Criminal Acts Reflecting Adversely on the Lawyer's Honesty, Trustworthiness or Fitness—Rule 8.4(b)*

■ Rule 8.4(b) provides that "[i]t is professional misconduct for a lawyer to . . . [c]ommit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects." This charge is based on Respondent's unauthorized signing of the Chois' names to the November 2005 E–2 applications—signatures that Respondent "disguised" so that they would not be rec-

---

**10.** As the Hearing Committee noted (*see* H.C. Rpt. at 46 n. 9), the wording of Rule 8.1(a) was modified, effective February 1, 2007, by deleting the world "material" before the word "fact." Accordingly, the modified rule applies to Respondent's Supplemental Response, which is dated March 22, 2007. *See* BX B at 16; BX 5 at 89. Conversely, Respondent's initial response is dated October 16, 2006 (*see* BX B at 15; BX 2 at 45); accord-

ingly, the pre-February 2007 version of Rule 8.1(a) applies to that document.

**11.** Additional misrepresentations found by the Committee were not sufficiently alleged in the Specification of Charges to support conclusions of Rules violations. *See* H.C. Rpt. at 47 n. 10. However, these factual findings (FF 95, 97, and 98) may be used in determining an appropriate sanction. *See In re Kanu*, 5 A.3d 1, 8 (D.C.2010).

ognized as his handwriting. FF 35. The Committee concluded that this conduct constituted a violation of Rule 8.4(b). H.C. Rpt. at 51. The Board agrees. It is unnecessary for Respondent to have been convicted of a crime in order for his conduct to fall within Rule 8.4(b). *In re Slattery*, 767 A.2d 203, 207 (D.C.2001). "A forged written instrument is one that purports to be genuine, but is not because it has been falsely made, altered, signed or endorsed." *In re Slaughter*, 929 A.2d 433, 444 (D.C.2007) (citing D.C.Code § 22–3241(b)). The findings here are clear and convincing evidence of Respondent's forgery of the Chois' visa applications. FF 35–39. It is a federal crime to forge signatures on petitions submitted to United States immigration authorities. *United States v. Ryan–Webster*, 353 F.3d 353, 357 (4th Cir.2003) (citing 18 U.S.C. § 1546(a)). Forgery constitutes criminal conduct reflecting adversely on an attorney's honesty, thus violating Rule 8.4(b). *Slaughter*, 929 A.2d at 445.

### F. Conduct Involving Dishonesty, Fraud, Deceit, and/or Misrepresentation—Rule 8.4(c)

Rule 8.4(c) provides that "[i]t is professional misconduct for a lawyer to ... [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation." The evidentiary record is replete with evidence of Respondent's deceitful/dishonest conduct vis-à-vis the Chois, as well as numerous misrepresentations to Bar Counsel. The record also contains clear and convincing evidence of Respondent's deliberate falsification of the Chois' signatures on official immigration petitions. Each of these acts constituted a misrepresentation in violation of Rule 8.4(c). *See In re Uchendu*, 812 A.2d 933, 938–39 (D.C.2002) (respondent signing his clients' names on

documents that required verification and submitting those documents to Probate Division constituted "false representation[s]" in violation of Rule 8.4(c)). We agree with the Committee's conclusion of a Rule 8.4(c) violation, as supported by clear and convincing evidence.

### G. Conduct Seriously Interfering with the Administration of Justice—Rule 8.4(d)

Rule 8.4(d) provides that "[i]t is professional misconduct for a lawyer to ... [e]ngage in conduct that seriously interferes with the administration of justice." Clear and convincing evidence supports the conclusion that Respondent violated Rule 8.4(d) in at least three ways. First, under *In re Cole*, 967 A.2d 1264, 1266 (D.C.2009), Respondent's neglect of the Chois' case caused "an unnecessary expenditure of time and resources" by USCIS in having to reopen and reconsider its prior final decision, as Mr. Wasserstein, on becoming the Chois' new counsel, undertook extensive efforts to rectify the situation created by Respondent and achieve retroactive recognition of the Chois' E–2 visa status. FF 85, 87–88. Second, by filing verified applications with forged signatures, Respondent "undermined the direct accountability" of applicants that the verification requirement of 8 C.F.R. § 103.2(a)(2) is meant to foster. *Uchendu*, 812 A.2d at 940–41. Third, the multiple misrepresentations Respondent made to Bar Counsel during the investigation in this matter materially interfered with Bar Counsel's ability to understand the true facts of this case and caused Bar Counsel needlessly to expend time and resources on assembling evidence to disprove those misrepresentations. *In re Boykins*, 999 A.2d 166, 174 (D.C.2010) (finding that the "respondent violated Rule[ ] ... 8.4(d) by misleading Bar Counsel during its investigation.").

## V. RECOMMENDED SANCTION

The Hearing Committee has recommended that Respondent be suspended for three years and be required to show fitness before resuming the practice of law. H.C. Rpt. at 57. Bar Counsel's sole exception to the Committee Report is the recommended sanction. Bar Counsel urges the disbarment of Respondent. Bar Counsel's Brief ("B.C.Brief") at 28. The Committee found that, "while the argument for disbarment is strong," Respondent's misconduct was not of the level calling for disbarment. H.C. Rpt. at 64. Respondent contends that "there is no need for any sanction or penalty" because "[t]here is no clear and convincing evidence of [any] violation" of the Rules. R. Brief at 12. However, Respondent does state that, "[i]n the event that the Board agrees with any of the violations, the sanction should be substantially less than the [Hearing Committee] report's recommendation of a three year suspension with fitness...." *Id.* at 16–17.

The appropriate sanction is one that is necessary to protect the public and the courts, maintain the integrity of the profession and deter other attorneys from engaging in similar misconduct. *See In re Scanio,* 919 A.2d 1137, 1144 (D.C.2007) (quoting *In re Reback,* 513 A.2d 226, 231 (D.C.1986) (en banc) ("*Reback II* ")). The sanction imposed must be consistent with cases involving comparable misconduct. *See* D.C. Bar R. XI, § 9(h)(1); *In re Elgin,* 918 A.2d 362, 373 (D.C.2007); *In re Berryman,* 764 A.2d 760, 766 (D.C.2000). The determination of a disciplinary sanction includes, *inter alia,* consideration of the nature and seriousness of the misconduct, prior discipline, prejudice to the client, the respondent's attitude, and circumstances in mitigation and aggravation. *See In re Hutchinson,* 534 A.2d 919, 924 (D.C.1987)

(en banc); *see also Slattery,* 767 A.2d at 214–15; *Elgin,* 918 A.2d at 376. We address these factors in turn.

### A. The Nature and Seriousness of the Misconduct

Bar Counsel's recommendation for disbarment is based substantially on its assertion that Respondent's dishonesty was of a "flagrant kind." B.C. Brief at 4. Bar Counsel contends that Respondent's dishonesty "includes not only his lying to his clients, a government agency, and Bar Counsel, but also his false testimony at the hearing, given in an effort to cover up his own misconduct...." *Id.* Bar Counsel rests its recommendation on the authority of *Kanu,* 5 A.3d 1 and *In re Cleaver-Bascombe,* 986 A.2d 1191 (D.C.2010) (per curiam) ("*Cleaver–Bascombe II* "). *Id.* The proven charges against Respondent are indeed serious. His misconduct involves neglect, dishonesty, a criminal act (forgery), and several aggravating circumstances, all relating to his handling of one immigration matter for Mr. and Mrs. Choi. The Committee has correctly found intentional neglect in failing to timely file E–2 applications, continuous misrepresentation of the status of the matter to the Chois, forgery of the Chois' signatures to re-file E–2 applications, subsequent misrepresentations to Bar Counsel to cover up Respondent's violations of the Rules and false testimony before the Committee. The prejudice caused by Respondent's misconduct was to a vulnerable client—an immigrant couple to this country who had invested their family savings in an E–2 visa project.

The Court has made clear that honesty is "basic" to the practice of law, and that lawyers have a greater duty than ordinary citizens to be scrupulously honest at all times. *See In re Mason,* 736 A.2d 1019, 1024–25 (D.C.1999) (quoting *Hutchinson,*

534 A.2d at 924). "There is nothing more antithetical to the practice of law than dishonesty...." *In re Daniel,* 11 A.3d 291, 300 (D.C.2011) (citing *Hutchinson,* 534 A.2d at 924).

### B. *Prior Disciplinary Action*

Respondent has two prior instances of discipline. By order of the Court, dated November 22, 2000, Respondent was suspended from the practice of law for 30 days. *In re Vohra,* 762 A.2d 544, 545 (D.C.2000) (per curiam). The suspension was stayed for two years on Respondent's acceptance of a practice monitor and other conditions. *Id.* The underlying misconduct involved Respondent's neglect of a client's immigration matter and his misrepresenting to his client that the work had been done when it had not. FF 102. Respondent also received an Informal Admonition, by letter dated December 27, 2007, for engaging in the unauthorized practice of law in the Commonwealth of Virginia. FF 103. In addition, Respondent was found in criminal contempt of this Court in 2010 for failure to provide documents in response to a subpoena issued by Bar Counsel. FF 105. Respondent was ultimately incarcerated for nine days. *Id.*

### C. *Prejudice to the Client*

The prejudice caused by Respondent's misconduct was clear—both actual and potential. FF 71. Mr. Choi had put the life savings of his family into the UPS store purchase. The E–2 visa that Mr. Choi needed for that investment was in severe jeopardy in June 2006 when he learned on his own that there was no E–2 application pending. FF 66–67. Mr. Choi had retained Respondent over 18 months previously to obtain that visa, and was repeatedly told it was awaiting approval—all a deception. FF 24, 65, 68. Fortunately,

new counsel was able to reverse the damage caused by Respondent and eventually obtained E–2 visas *nunc pro tunc* for Mr. and Mrs. Choi. FF 88. Even with Respondent refunding his fee, the Chois paid fees over and above that amount due to Respondent's missteps. FF 89–90. *See Kanu,* 5 A.3d at 15 (consideration of both realized and potential harm to client).

### D. *Respondent's Attitude and Mitigating and Aggravating Circumstances*

Respondent apparently recognized the seriousness of his misconduct in July and August 2006. At that time, he cooperated with his replacement counsel (Mr. Wasserstein) in drafting and signing a strong affidavit admitting his neglect to support a motion to reconsider the denial of the Chois' E–2 visa petition—a denial which could be laid solely at the feet of Respondent. FF 85. In that signed affidavit, Respondent stated that "[t]he errors and misrepresentations made in this matter were solely the fault of counsel and not the applicants...." BX 1 at 32, ¶ 16. Once Bar Counsel's investigation began, however, Respondent's view of his misconduct altered dramatically, *e.g.,* he placed the blame for the delayed E–2 visa filings on his "clients' inability to get all the documents required to support their application." BX 5 at 92. Before the Committee, Respondent denied any wrongdoing, Tr. at 720–34; FF 77, a theme he has carried through in his brief before the Board:

> There is no clear and convincing evidence of a violation of any of the 14 rules which Bar Counsel charges in this lengthy, creative and enthusiastic complaint.

R. Brief at 12.

In light of Respondent's admissions in his signed August 9, 2006, affidavit, the above statement to the Board is astonish-

ing. Whatever goodwill Respondent earned by his cooperative efforts on behalf of his clients once he was replaced as their attorney in the immigration matter, he has since squandered. There is one mitigating factor, however. Respondent did refund the Chois' $5,000 retainer payment a few months after his termination. FF 83. It is noted that such refund was made only after Bar Counsel's investigation commenced. FF 78–83.

Aggravating factors include Respondent's misrepresentations to Bar Counsel beyond those charged in the Specification, and therefore not relied upon in support of the finding of a Rule 8.1(a) violation. *See* FF 95, 97, 98; H.C. Rpt. at 47 n. 10. As did the Committee, we also include as an aggravating factor Respondent's false testimony to the Committee on his supposed authorization from the Chois to sign their names to visa applications. FF 97; H.C. Rpt. at 61. As the Court has held, "an attorney deliberately attempting to cover up misconduct is absolutely intolerable, regardless of whether it is under oath or during an investigation." *In re Chapman*, 962 A.2d 922, 925 (D.C.2009) (per curiam) (citing *In re Shillaire*, 549 A.2d 336, 337–38 (D.C.1988)). *See also Cleaver–Bascombe II*, 986 A.2d at 1200. The Committee found Respondent's testimony that the Chois had authorized him to sign their visa applications a "lie." H.C. Rpt. at 62.

### E. The Mandate to Achieve Consistency

The Board has carefully considered the appropriate sanction and determined that the Committee's recommendation of a three-year suspension plus a fitness requirement is appropriate and consistent with Court precedent. Sanctions for neglect of a single (or two) immigration matters with attendant dishonesty run from 30–day suspensions to disbarment, depending on the scope of the neglect and dishonesty. *See, e.g., Cole*, 967 A.2d 1264 (30–day suspension where respondent neglected his client's asylum application, falsely assured his client that the application had been filed, and falsely explained that the delay was attributable to the court); *Kanu*, 5 A.3d 1 (disbarment where respondent counseled her clients to provide false information on visa applications, failed to tell clients that their application had been denied, evaded their inquiries, and lied to them and Bar Counsel about refunding fees).

The present facts are decidedly more serious than in *Cole*. Respondent here not only misrepresented matters to his clients (as in *Cole*), but forged a visa document, made numerous misrepresentations to Bar Counsel, and lied before the Committee. Respondent also has a prior disciplinary record. However, we also find that the misconduct involved in the instant case is not as serious as the misconduct in *Kanu*. Respondent herein refunded the fees to the Chois and thus did not (as in *Kanu*) withhold funds and lie about repaying them. Respondent here also did not implicate his clients in an illegal immigration fraud. In fact, Mr. Choi testified "that the Chois would have been readily available to sign any further required immigration forms." FF 37. Bar Counsel also cites *Cleaver–Bascombe II* in support of its argument that Respondent be disbarred. In *Cleaver–Bascombe II*, the respondent was disbarred for submitting a false CJA voucher to the Court for hours that she had not worked, and subsequently lying under oath before the Committee to cover up the misconduct. Respondent's dishonesty here is less serious in that there was no fraud or attempt to obtain funds for personal gain. The forgery here was a misguided attempt to obtain visas for Re-

spondent's clients—misguided because Respondent did not want his clients to learn of his delinquency in re-filing their applications.

Respondent's dishonesty was not of a flagrant kind. It did not involve dishonesty for personal gain. *Cf. In re Pelkey*, 962 A.2d 268 (D.C.2008) (disbarment where respondent transferred money from an account belonging jointly to respondent and someone else to an account within respondent's exclusive control); *In re Goffe*, 641 A.2d 458, 465 (D.C.1994) (disbarment where respondent's dishonesty "was part of a plan to commit fraud intended to benefit himself."). Nor is Respondent's dishonesty as pervasive as that of the respondent in *In re Shariati*, 31 A.3d 81 (D.C.2011), where the respondent was disbarred for commission of over 100 Rules violations in connection with eleven immigration matters, including intentional neglect, falsifying documents, and lying to clients. The Hearing Committee in *Shariati* "devoted nearly twenty-five pages" to the respondent's " 'lack of candor,' " " 'disrespect for the law,' " and " 'vindictiveness.' " *Shariati*, 31 A.3d at 86 (quoting Hearing Committee report).

We conclude the following authorities support a multi-year suspension. In *Ukwu*, the Court imposed a two year suspension and a fitness requirement where an immigration attorney engaged in a pattern of neglect over the course of five separate immigration matters, dishonesty as to one of the matters over receipt of the respondent's fee, false testimony to the Committee to cover up the misconduct, misrepresentation to the Board of Immigration Appeals, and counseling a client to submit falsified documents to the INS. This pattern of conduct and number of matters is more serious than in the pending matter. The respondent in *Ukwu* and

Respondent in the instant case had similar prior disciplinary histories. However, Respondent in the instant case, unlike the respondent in *Ukwu*, mitigated his misconduct by signing an affidavit admitting much of his misconduct in order to help the Chois obtain their visas.

In *In re Silva*, 29 A.3d 924 (D.C.2011), the Court imposed a three-year suspension and a fitness requirement for misconduct in connection with a single matter—falsely notarizing signatures on an easement agreement and falsely stating that he had recorded the agreement. *Silva, supra*, 29 A.3d at 925. The respondent in *Silva* also misrepresented facts to Bar Counsel and before the Hearing Committee. *Id.* Both the respondent in *Silva* and Respondent in the instant matter have demonstrated a "lack of remorse"; however, Respondent herein initially showed remorse and cooperated in getting his clients' visas issued. An aggravating factor in *Silva* was the respondent's addiction to cocaine, about which he lied under oath and to Bar Counsel. *Id.* Herein, Respondent was convicted of criminal contempt for failure to cooperate with Bar Counsel's investigation. FF 105.

*In re Kline*, 11 A.3d 261 (D.C.2011) involved an attorney suspended for three years without a fitness requirement where the attorney misrepresented a proposed settlement agreement to a client, forged the client's signature on the settlement, and paid the adverse parties with his own funds to hide the true events from his client. *Kline*, 11 A.3d at 262. Numerous Rules violations were found, including negligent misappropriation, the criminal act of forgery, and multiple acts of dishonesty. *Id.* at 262–63. The respondent's dishonesty, however, was not grounded in malice, but weakness. *Id.* at 267. Moreover, the respondent in *Kline* presented a substantial amount of evidence in mitigation, in-

cluding genuine remorse, cooperation with Bar Counsel, a previously unblemished 27–year legal practice, and character witnesses who testified that the respondent's conduct was an aberration. *Id.* at 266 n. 6. Nevertheless, in light of the findings of forgery, blatant deceit of his client, misappropriation of funds, and prejudicial disregard of client interests, the Court set a "lodestar" for such serious misconduct of a three-year suspension. *Id.* at 267. The instant Respondent does not have the mitigating factors that were present in *Kline;* however, Respondent's misconduct is less serious, as it does not involve commingling or misappropriation.

*Slaughter* also resulted in a sanction of a three-year suspension and a fitness requirement. In *Slaughter,* the respondent created a false contingency agreement and fabricated pleadings as part of a scheme wherein he pretended to represent the state of Arkansas in Superfund litigation. *Slaughter,* 929 A.2d at 436–39. Respondent's misconduct also included the forging of the signature of a state assistant attorney general in violation of Rule 8.4(b) (commission of a criminal act that reflected adversely on the attorney's honesty, trustworthiness, or fitness as a lawyer) and alteration of his law firm's copy of the state's motion to intervene to disguise the fact that the respondent had not in fact represented the state in the litigation. *Id.* The Court described the respondent's misconduct as "criminal and extreme, and … continu[ing] over an extended period of time." *Id.* at 447 n. 9. The Court further stated that it "would have [had] no hesitation in ordering disbarment" but for the Board's recommend lesser sanction and the absence of any exception by Bar Counsel. *Id.* Although the instant matter contains aggravating factors not present in *Slaughter,* the misconduct in *Slaughter* is

more serious. There the respondent engaged in an elaborate scheme of deceit to perpetuate a false situation that he had created—his fabricated attorney/client relationship with Arkansas in a large piece of environmental litigation—all for his personal benefit as an attorney.

The Board is of the view based on its analysis of the severity of Respondent's misconduct as well as the evidence in aggravation, that a three-year suspension is appropriate and justified. A sanction of disbarment would not be in accord with prior disciplinary authority. Respondent's forgery and deception were not grounded in malice, but in weakness. *Kline,* 11 A.3d at 267. Respondent's conduct here, while falling far below the standards acceptable for members of the Bar, does not rise to the level of those who have been disbarred.

### F. *The Need for a Fitness Requirement*

The Hearing Committee expressed "serious doubts about Respondent's fitness to practice law," and, consequently, recommended that a fitness requirement be imposed. H.C. Rpt. at 66–69. We agree with the Hearing Committee's recommendation.

In order to justify the imposition of a fitness requirement, " 'the record in the disciplinary proceeding must contain clear and convincing evidence that casts a serious doubt upon the attorney's continuing fitness to practice law.' " *In re Cater,* 887 A.2d 1, 24 (D.C.2005) (quoting Board report). In assessing whether this standard has been met, we consider: (1) the nature and circumstances of the misconduct; (2) whether the attorney recognizes the seriousness of the misconduct; (3) the attorney's conduct subsequent to the misconduct at issue, including steps taken to remedy past wrongs and prevent future ones; (4) the attorney's present character;

and (5) the attorney's present qualifications and competence to practice law. *Id.* at 25, 21 (citing *In re Roundtree,* 503 A.2d 1215, 1217 (D.C.1985)).

Application of these factors supports the Committee's finding that the record in this proceeding contains clear and convincing evidence casting serious doubt upon Respondent's continuing fitness to practice law. As we have said, the nature and circumstances of Respondent's misconduct are serious. The misconduct in this case involves intentional neglect, dishonesty, the criminal act of forgery, and numerous misrepresentations by Respondent to his clients regarding the status of their matter. Further, Respondent has failed to recognize the seriousness of his misconduct. Although Respondent initially cooperated with successor counsel in filing the August 9, 2006, affidavit in which he admitted much of his misconduct, Respondent has subsequently attempted to recant those statements in connection with this disciplinary proceeding, and has even gone so far as to claim that "[t]here is no clear and convincing evidence of a violation of any of the" Rules that Bar Counsel has charged. R. Brief at 12. In addition, while Respondent did take at least one step toward remedying his past wrongs by refunding his $5,000 fee to the Chois, Respondent's actions subsequent to the misconduct at issue in this case include the extraordinary fact that Respondent was found in criminal contempt and incarcerated for nine days for failing to provide documents in response to a subpoena issued by Bar Counsel in connection with this very disciplinary proceeding. Further, Respondent has made multiple misrepresentations to Bar Counsel to cover up his misconduct and provided false testimony before the Committee. These facts also reflect adversely on Respondent's present character. *See In re Chisholm,* 679 A.2d 495, 504 (D.C.1996) (finding the fact "that the Hearing Committee did not believe some of the testimony which [the respondent] gave under oath" reflected adversely on the respondent's present character). Accordingly, we recommend that, before being permitted to resume the practice of law, Respondent should be required to demonstrate his fitness to do so pursuant to D.C. Bar R. XI, § 3(a)(2).

## V. *CONCLUSION*

The Board recommends that the Court find Respondent to have violated Rules 1.1(a) and (b); 1.3(a), (b)(1), (b)(2), and (c); 1.4(a) and (b); 3.3(a)(1); 8.1(a); and 8.4(b), (c), and (d). We further recommend that Respondent be suspended from the practice of law for three years, and that Respondent be required to demonstrate his fitness to practice law before his reinstatement.

BOARD ON PROFESSIONAL RESPONSIBILITY

By: */RSB/*

Ray S. Bolze

Chair

Date: December 14, 2011

All members of the Board concur in this Report and Recommendation.